Ronald Ray HOWARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 71739.

Court of Criminal Appeals of Texas, En Banc.

June 19, 1996.

Opinion After Grant of Rehearing Dec. 18, 1996.

Rehearing Denied March 19, 1997.

Allen Tanner, Houston, for appellant.

Robert Bell, Dist. Atty., Edna, Jim Vollers, Austin, Matthew Paul, State's Atty., Austin, for State.

Before the court en banc.

### OPINION

MANSFIELD, Justice.

A Travis County jury[1] convicted appellant, Ronald Ray Howard, of capital murder. At the punishment phase of the trial, the jury found appellant to be a "future danger" under Article 37.071 § 2(b)[2] and, further, declined to find mitigating circumstances sufficient to militate against application of the death penalty under Article 37.071 § 2(e)[3].

---

1. Appellant's trial was held in Travis County on a change of venue from Jackson County.

2. All Article references are to those in the Texas Code of Criminal Procedure then in effect.

3. All references to "Special Issue One," infra, are addressed to the "future dangerousness" determination, while all "Special Issue Two" references are focussed upon the mitigation resolution.

Article 37.071, § 2, provides in relevant part:

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

\* \* \* \* \* \*

(c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a

The trial court sentenced appellant to death. We will affirm the judgment of the trial court.

The facts pertaining to the guilt/innocence phase of the prosecution are virtually uncontested. The victim, Department of Public Safety Trooper Bill Davidson, pulled appellant over in the course of a routine traffic stop on April 11, 1992, in Jackson County. Appellant was driving a stolen car and apparently decided to shoot Trooper Davidson rather than submit to the stop. When the trooper approached appellant's automobile, appellant shot him in the neck, killing him. Appellant confessed to the killing on three distinct occasions.[4]

Appellant raises thirty-four points of error in his brief on appeal. There are no evidentiary insufficiency points of error; hence, we will address his points in chronological order where appropriate.

In point of error twenty-five, appellant contends the trial court committed error when it granted the State's challenge for cause against veniremember Martinez. The State's challenge alleged a bias against the law upon which the State was entitled to rely, to wit, that veniremember Martinez would hold the State to a burden of proof greater than "beyond a reasonable doubt." Appellant, however, insists this veniremember's voir dire responses manifested a capacity to hold the State to its appropriate burden.

Article 35.16(b)(3) authorizes the State to challenge for cause any veniremember who has a bias or prejudice against "any phase of the law upon which the state is entitled to rely for conviction or punishment." When a potential juror vacillates on the question of his or her ability to follow the law as it pertains to the juror's legal role in a criminal proceeding, this Court defers to the findings of the trial court. *Adanandus v. State,* 866 S.W.2d 210, 222 (Tex.Crim.App. 1993); *Green v. State,* 840 S.W.2d 394, 405 (Tex.Crim.App.1992); *Brown v. State,* 913 S.W.2d 577, 580 (Tex.Crim.App.1996). A vacillating veniremember is one who gives contradictory responses to those voir dire questions which test the veniremember's ability to follow the legal mandates set by the Legislature and by the holdings of this Court. *Adanandus v. State,* 866 S.W.2d at 222; *Perillo v. State,* 758 S.W.2d 567, fn. 10 (Tex.Crim.App.1988). The record in the instant case indicates that veniremember Martinez was the consummate vacillating veniremember.

The State and appellant both were given multiple opportunities to query Martinez concerning his bias. Initially, Martinez told the prosecutor that he would require the State to prove the elements of this crime beyond *all* doubt. Yet, in response to appellant's questions, veniremember Martinez stated he would comply with the law and hold the State to its proper legal burden. When the prosecutor resumed questioning, the veniremember acknowledged once again that he would require the State to satisfy a burden greater than "beyond a reasonable doubt." Appellant was then given another opportunity to cross-voir dire, and the veniremember professed that he could convict a defendant if the State got "over the hump" of the reasonable doubt standard. This veniremember next acknowledged to the prosecutor that he would require the State to meet a burden greater than a "beyond a reasonable doubt," to answer the special issues in a manner

special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this article.

\* \* \* \* \* \*

(e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

4. First, appellant gave a voluntary, tape-recorded confession shortly after his arrest. Later, appellant gave a second written confession to police. Both were admitted into evidence at trial. In both instances, appellant conceded shooting the peace officer with conscious knowledge of the victim's status as such. Finally appellant confessed to a grand jury. The recording of the grand jury proceeding was also played to the jury.

consistent with a defendant receiving the death penalty. The State challenged venire-member Martinez for cause.

Appellant requested, and was given, yet another opportunity to question Martinez before the trial court made its ruling. Upon appellant's further questioning, venire-member Martinez indicated that he would hold the State to its appropriate burden. Yet, in response to a subsequent prosecution question, Martinez again indicated that he would hold the State to a heightened burden if the defendant was to receive the death penalty. Martinez, upon further questioning from appellant, indicated he could follow the law as it pertained to the State's burden. Finally, the prosecutor asked the trial court if questioning should proceed. The trial court ended further voir dire interrogation, expounding, "This [could] go on all day." The trial court granted the State's challenge for cause.

■ Veniremember Martinez distinctly demonstrated both that he could employ the standard of proof and that he could not; that he was biased against the law and that he was not. "Such a record 'presents an adequate basis to support the trial court's ruling either that the venireman was challengeable for cause . . . or that [he] was not.'" *Adanandus v. State*, 866 S.W.2d at 221 (quoting *Green v. State*, 840 S.W.2d at 406) (emphasis in original). Thus we cannot say the trial court abused its discretion when it granted the State's challenge for cause against veniremember Martinez. Point of error twenty-five is overruled.

In points two through seven, appellant complains that his voir dire examination was impermissibly restricted when the trial court refused to allow him to ask the venire six distinct questions. Appellant specifically contends that his state constitutional rights to counsel and trial by jury were restrained because the trial court impinged on counsel's right to interrogate the panel. *See Trevino v. State*, 572 S.W.2d 336 (Tex.Cr.App.1978).

■ Article I, § 10, of the Texas Constitution guarantees the right to counsel. Such right includes the right of counsel to question members of the venire panel in order to intelligently exercise peremptory challenges. *Ex parte McKay*, 819 S.W.2d 478 (Tex.Cr. App.1990); *Shipley v. State*, 790 S.W.2d 604 (Tex.Cr.App.1990). When an appellant challenges a trial judge's limitation on the voir dire process, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether the appellant proffered a proper question concerning a proper area of inquiry. *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), cert. denied, 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992); *Cockrum v. State*, 758 S.W.2d 577, 584 (Tex.Cr.App.1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989). A proper question is one which seeks to discover a venire-member's views on an issue applicable to the case. *Caldwell v. State*, supra at 794; *Guerra v. State*, 771 S.W.2d 453, 468 (Tex.Crim. App.1988). If a proper question is disallowed, harm to the appellant is presumed because he has been denied the ability to intelligently exercise his peremptory strikes. *Caldwell v. State*, supra. However, a trial court is given broad discretionary authority to impose reasonable restrictions on the voir dire process. *Caldwell v. State*, supra at 793. In particular, a trial court may restrict confusing or misleading voir dire questions. *See Jones v. State*, 850 S.W.2d 223 (Tex.App.-Fort Worth 1993, pet.ref'd).

■ Most important, where the trial court places no absolute limitation on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase an improperly phrased query or else waive the voir dire restriction. *Trevino v. State*, 815 S.W.2d 592, 601 (Tex.Cr.App. 1991); *Guerra*, supra at 468.

In the instant case, appellant attempted to propound the following six questions to veniremember David Cortez, each question corresponding to points of error two through seven, respectively:

(1) "If in a capital murder trial where a defendant is convicted during the first part of the trial of capital murder of a police officer, do you believe that going into the second phase of the trial, the punishment phase of the trial, you would automatically answer the special issues in a manner that

the Defendant would always receive the death penalty?"

(2) "If during a capital murder trial you convict a defendant of capital murder of a police officer during the first part of a trial and you go into the second part of a trial and you have special issues to answer, do you believe that you could ever answer the special issues in a manner consistent with a defendant receiving a life sentence?"

(3) "If in a given capital murder trial during the first phase of the trial you found the Defendant guilty of killing a police officer, during the second phase of the trial do you believe that you would have an open mind in reviewing the evidence, you would listen to all of the evidence in determining how you're going to answer the special issues during that phase of the trial?"

(4) "If in a capital murder trial during the first part of the trial you find the Defendant guilty of capital murder of a police officer, do you feel that in answering Special Issue No. 1 during the second part of the trial, is there a probability that the defendant Ronald Howard, or that a defendant would commit criminal acts of violence that would constitute a continuing threat to society, would you always answer that question 'Yes'?"

(5) "Okay. And if you convicted someone of capital murder of a police officer during the second phase of the trial, as to Special Issue No. 2, 'Taking into consideration all the evidence including the circumstances of the offense, the Defendant's character and background and the personal doubt thereof, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed,' would you always answer that special issue 'No'?"

(6) "If during the first phase of a capital murder trial you convict a defendant of killing a police officer, during the second phase of the trial can you ever envision a hypothetical case where you could answer

the special issue consistent with the defendant getting a life sentence?"

■ The State objected to each of the six questions, and the trial court sustained the objections. The trial court then prohibited appellant from asking the six questions to the rest of the venire panel.[5] Thereupon, appellant did not attempt to rephrase his questions, but rather, began questioning veniremember Cortez about an unrelated mitigation issue. We find no improper voir dire restriction in this instance.

The trial court limited its restrictive order only to the *form* of these six questions and not to their *substance*. Immediately after the trial court sustained the State's objection, the following exchange took place:

APPELLANT: So we ask the court to allow us to ask these questions of jurors and get answers. And the court has sustained all the State's objections as to those questions; is that correct?

THE COURT: Yes sir.

APPELLANT: And does the court have any order at this time?

THE COURT: Yes, sir. I'll order you not to ask the questions which I have overruled this morning *in the same manner that you have asked them*, to the other jurors, the rest of the prospective jurors.

APPELLANT: Do you mean the questions you sustained the State's objections to this morning?

THE COURT: This morning. Okay. *And then as phrased and as you have asked them this morning.* And I'll tell you not to ask the other prospective jurors— for you to ask those same questions—

APPELLANT: Okay. So—

THE COURT:—*as phrased.*

APPELLANT: Okay. So I'm being ordered not to go into those questions with any other jurors for the rest of the trial; is that correct?

THE COURT: Yes sir.

APPELLANT: Okay. Thank you, Your Honor.

5. Cortez was the second veniremember questioned during individual voir dire. Thus appellant was precluded from asking these six

questions, *in the form they were asked,* to all subsequent veniremembers.

THE COURT: *As phrased. As asked this morning.*

The trial court clearly limited its preclusive ruling to the form of appellant's questions and not to their substance. The trial court did not order counsel to discontinue questioning in the particular area of inquiry; rather, the judge precluded a particular question. As explained, supra, where there is no absolute limitation placed on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase the improperly phrased query or waive the voir dire restriction. *Trevino v. State,* 815 S.W.2d at 601; *Guerra v. State,* supra at 468.[6]

In the instant case, appellant did not sufficiently predicate his questions with an explanation of the law as it pertained to the special issues. Rather, appellant pointedly inquired as to how veniremember Cortez would resolve the special issues, never adequately describing the legal process or the role a juror plays in such a process.[7] Without an adequate explanation, the veniremember might infer that the law permitted, or even required, him to manipulate his answers to the special issues.[8] While such an omission can serve to confuse a potential juror, it is not likely to elicit a meaningful or intelligent response.

This Court notes with interest that appellant, later in the voir dire process, asked questions which were essentially equivalent to the six questions at issue here. For instance, in examining veniremember Mendez, appellant had the following exchange:

Q: Okay. Anyway, first part of the trial let's say you're sitting on the jury, you hear all of the evidence and you convict Ronald Howard of killing Trooper Bill Davidson; okay? We then go to the second phase of the trial. And during the second phase of the trial you've got these special issues. And prior to answering these special issues you will receive evidence during the second phase of the trial of certain types; okay?

Appellant next described in detail the legal process surrounding the punishment phase and the juror's role in that process. Appellant then asked:

Q: Now, in a capital murder case—and let me ask you, going into the second phase of the trial will you have an open mind as to both special issues?

A: Yes.

Q: So you would listen to all of the evidence and then decide how much weight to give the evidence in answering the special issues; is that correct?

A: Yes.

Appellant was able to ask, albeit in a different *form,* the *substance* of his six special issue voir dire inquiries. In fact, the record is replete with instances in which appellant asked substantially similar questions of the venire panel. As we stated supra, if the trial

---

6. Although the trial court did not provide a legal justification for its preclusive ruling, we will sustain the ruling on any issue of law applicable to the case. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

7. The entire legal predicate for the six questions follows:
APPELLANT: Mr. Cortez, how you doing this morning?
VENIREMEMBER: Just fine.
APPELLANT: Remember yesterday we talked about the first part of the trial?
VENIREMEMBER: Okay.
APPELLANT: That you either find the Defendant guilty or not guilty of capital murder of a police officer; okay?
VENIREMEMBER: Okay.
APPELLANT: And then the second part of the trial we discussed you then look at the special issues. There's two special issues, one as to future dangerousness and one as to whether or not there's any mitigation. And depending how you answer the special issues after reviewing the evidence will determine whether or not the Defendant receives life in prison or the death penalty; correct?
VENIREMEMBER: Yes.
Appellant then proceeded to ask the six questions. Although veniremember Cortez was involved in a lengthy voir dire examination the preceding day in which the special issues were discussed, appellant made no attempt to refamiliarize Cortez with the law as it pertained to the special issues.

8. Although those at the bench and bar might easily comprehend appellant's questions, such questions might nevertheless be confusing to those lay-people unfamiliar with the complex character of the Texas bifurcated trial and special issue scheme.

court merely limits a question due to its *form*, trial counsel must determine the basis of the limitation and attempt to fashion a query which complies with the perceived inadequacy. Here, appellant made no attempt to determine the basis of the trial court's ruling, and made no attempt to comply with that ruling.[9] Appellant is not entitled to any *particular* form of question; rather, appellant is authorized to ask "proper" questions in a particular *area of inquiry*. *Trevino v. State*, supra at 601; *Guerra v. State*, supra at 468. Hence, if the trial court precluded inquiry into a proper *area* of voir dire examination, thereby gutting the *substance* of a question, appellant would have been denied the right to intelligently exercise his peremptory strikes. *Id.* Yet the trial court must be given some discretion to regulate the semantics or phrasing of a question, and to preclude those questions which the trial court might, in its discretion, find improperly constructed. As we held in *Boyd v. State:*

> While the right of an accused to question a veniremember freely and broadly is a right that should never be unnecessarily limited or restricted, the trial courts may impose reasonable restrictions on the exercise of voir dire examination. *Boyd v. State*, 811 S.W.2d at 115–16.

Appellant's reliance on *Nunfio v. State*, 808 S.W.2d 482 (Tex.Cr.App.1991), is misplaced. In *Nunfio* defense counsel sought to question the veniremembers regarding their ability to remain "fair and impartial" given the victim's vocation as a nun. The trial court broadly precluded all such questions. Such a preclusive ruling can only be characterized as a prohibition respecting the entire substance of such a question, and is not directed to its form. Hence, *Nunfio* has no application to these facts. Here, the trial court had discretion to require appellant to rephrase his question, which appellant failed to do. Points of error two through seven are overruled.

In point of error one, appellant contends the trial court committed reversible error when it granted the state's challenge for

cause of veniremember Durling. During voir dire, Durling articulated that she would require the State to prove an unrelated prior murder before she could find a defendant to be a future danger. The relevant voir dire exchange follows:

> PROSECUTOR [to veniremember Durling]: And let me just follow up. You may hear other evidence about the Defendant's past and it may be evidence about some bad acts or it may not be. But irrespective of what other evidence you may receive, *what you're telling me and the Court is that in order for you to answer Special Issue No. 1 "Yes," that you would require of the State that they show that the Defendant has murdered someone before; is that correct?*
>
> A: Yes.

Appellant's attorney followed up with the following:

> Q: ... So, what it comes down to is Mr. Bell—you told Bell *you would require proof of a prior murder in order to answer that Special Issue No. 1 "Yes"*; okay?
>
> A: Yes.
>
> Q: Now, I'd like you to rethink that. The way I've explained it to you, do you still feel that way, that the State would have to show that to you before you could ever answer that special issue "Yes"?
>
> A: Yes, I do.
>
> Q: *So if a person doesn't have a prior conviction for murder, you could never answer Special Issue No. 1 "Yes".*
>
> A: Correct. Correct.
>
> Q: And there's nothing I could say that would make you change your mind; is that correct?
>
> A: That's correct.

The State challenged this veniremember for cause arguing that she had a bias or prejudice against a phase of the law upon which the State was entitled to rely. *See* Article 35.16 § b(3). To support its proposition, the state cited *Fuller v. State*, 829

---

9. Appellant apparently assumed the trial court adopted the prosecutor's argument in ruling on this objection. Yet the trial court did not provide any rationale, and limited its prohibitive ruling only to the form of appellant's question.

S.W.2d 191 (Tex.Cr.App.1992). In *Fuller* we held:

> [A veniremember] may not wholly refuse, before hearing any evidence whatsoever, to consider an accused for the death penalty unless he has been convicted of murder before. *Fuller v. State*, 829 S.W.2d at 200.

Appellant concedes that Durling indicated she would never affirmatively find "future dangerousness" unless the State proved the defendant was guilty of a prior murder. Yet, appellant solicits an extension of this Court's subsequent holding in *Garrett v. State*, 851 S.W.2d 853 (Tex.Cr.App.1993). Appellant maintains that Durling merely required more than the "legally sufficient minimum" to find future dangerousness; hence, the challenge for cause was erroneous and reversal necessary under the *Garrett* analysis.

▮ This Court's recent holding in *Rachal v. State*, 917 S.W.2d 799, 812 (Tex.Crim. App.1995) (White, J., plurality opinion), is instructive. Potential jurors must be able to set aside their personal preferences and biases to consider death eligible *all those defined as death eligible* by § 19.03 of the Texas Penal Code and Article 37.071.[10] *Id.*, at 812–13. Veniremembers may not displace the broad legal categories of death eligibility with their personal agendas. *Id.*, at 813. Since veniremember Durling unequivocally stated an unwillingness to set aside her view regarding death eligibility—such definition adding to the Article 37.071 statutory definition of those eligible for the death sentence in Texas—she possessed a bias against that law.

This Court has consistently held that veniremembers like Durling can be challenged for cause because they would add additional legal elements to the State's burden at trial. *White v. State*, 779 S.W.2d 809 (Tex.Crim.App.1989); *Phillips v. State*, 701

S.W.2d 875 (Tex.Crim.App.1985). The trial court did not abuse its discretion when it dismissed Durling for cause. Appellant's first point of error is overruled.

▮ In point of error number twenty-four, appellant again avers *Garrett* error. Appellant contends the State was improperly granted a causal strike against veniremember Ochoa. Specifically, appellant argues that a veniremember who requires more than the "legal minimum" to find "future dangerousness" is not challengeable for cause. Appellant is incorrect in this circumstance.

Veniremember Ochoa conceded that violent illegal acts directed toward property were "criminal acts of violence that would constitute a continuing threat to society" under her conception of Article 37.071, § 2(b)(1). Yet in spite of her understanding, the veniremember indicated that she would not affirmatively find future danger unless the State proved such acts of violence to be directed toward people. The effect of this belief is that even if this veniremember believed, beyond a reasonable doubt, that a defendant presented a continuing threat to society, by virtue of a propensity to commit violent acts directed toward property, she would never answer Special Issue One "Yes" unless the State met her personal dictates. Stated again, Ochoa acknowledged that violent property crimes could constitute a continuing threat to society under Article 37.071 § 2(b)(1), yet she required proof of violence against people. Such a position indicates that veniremember Ochoa would supplant the legal categories of death eligibility with her personal preferences and biases. Veniremembers with such bias can be causally challenged. *Rachal v. State*, 917 S.W.2d at 813. Point of error number twenty four is overruled.

---

**10.** Appellant misconstrues *Garrett* which generally discussed the quantum of evidence required to convince a veniremember beyond a reasonable doubt whether a defendant was a future danger. In *Garrett* the venireperson simply stated that a certain limited category of evidence would be insufficient to affirmatively find future dangerousness. Yet *Garrett* did not create an avenue for jury displacement of the broad statutory categories of death eligibility. A veniremember like Durling—by demanding the existence of a single characteristic to find future dangerousness—is substituting her own peculiar dictates of sufficiency, and hence is precluding the consideration of *all other evidence*. Such a position, by effectively thwarting the application of a capital sentence in virtually every single case, is a bias against the Legislature's broad category of death eligibility.

In points of error sixteen through twenty-three, appellant claims error arguing that the trial court granted the State's causal challenges against veniremembers Koneski, Pauwells, Cogswell, Gains, Walls, Terry, Ramos and Denning, respectively, without affording appellant the opportunity to examine those veniremembers. *See Perillo v. State,* 656 S.W.2d 78 (Tex.Cr.App.1983). We have historically held that a trial court commits error when it denies a defendant the opportunity to examine veniremembers before excusal. *Drinkard v. State,* 776 S.W.2d 181 (Tex.Cr.App.1989); *Felder v. State,* 848 S.W.2d 85 (Tex.Cr.App.1992). However, we inevitably deemed a trial court's error in refusing to allow a defendant to question a veniremember to be harmless if, at the time the trial court granted the State's challenge for cause, the veniremember, through questioning by the prosecutor or the trial court, made it absolutely clear that his views on the death penalty would have prevented or substantially impaired the performance of his duties as a juror in accordance with his instructions and his oath. *Robinson v. State,* 851 S.W.2d at 236; *Perillo v. State,* supra, at 80–81. Judge Baird has argued persuasively that this Court should cease labeling *Perillo* conduct as error while habitually holding that error harmless. *Robinson v. State,* 851 S.W.2d 216, 238 (Tex.Crim.App.1991) (Baird, J. concurring). We agree. Where it is clear, after inquiry by the trial court, that venirepersons are conclusively biased against a phase of the law upon which the State is entitled to rely at guilt/innocence or at punishment, and where such views prevent or substantially impair the performance of their duties as jurors, it is not error to deny a defendant an opportunity to question those venirepersons before granting the State's challenge for cause.

With respect to the eight veniremembers at issue here, the trial court did grant the State's challenges for cause without affording appellant the opportunity to question the veniremembers. However, such conduct was not error because each veniremember was questioned at length and clearly demonstrated that he or she would never answer the special issues in a manner which resulted in the imposition of the death penalty. We will deal with each veniremember in turn.

Veniremember Gains established her absolute position through the following voir dire exchange:

PROSECUTOR: But if you're telling me "I can't give the death penalty," then aren't you telling me "I don't care what the facts are"—

A: Yes, I am telling you—

Q: —"I'm not going to answer this 'Yes' and 'No' because that gives him the death penalty." Is that what you're telling me?

A: Yes.

Q: Okay.

THE COURT: Have you read both of those special issues?

PROSECUTOR: Yes I have Judge.

PROSECUTOR: Have I read both these special issues to you?

A: Yes.

Q: Do you feel like you understand those special issues well enough to answer my questions?

A: Yes, I do.

Q: Okay.

THE COURT: Well, in other words, he has both those—as with all the other jurors, both those special issues up there on the board—and so—for the jurors to read. And you have read it, both of those special issues?

VENIREMEMBER: I read it along with him. Yes, I did.

THE COURT: All right.

PROSECUTOR: And so what I'm asking you, and I have to ask it in a very legal fashion, if you'll just permit me to do that, and if you don't understand me, just tell me, "Hey, I don't understand." Because what you're telling me is that you can't give the death penalty correct?

A: Right.

Q: And that's how you feel. That doesn't have anything to do with this case or any other case?

A: No, it doesn't.

Q: What you're saying is that just because of your feelings about putting another person to death, you would not be able to participate in the death penalty?

A: Right.

 \* \* \* \* \* \*

Q: Now that you've seen these two special issues and you know that the result of your answers to those two questions, if you said "Yes" and "No," would be the imposition of the death penalty to the Defendant, do you, yourself, because of your feelings about the death penalty and your scruples against it, feel like that you could not impose the death penalty in a proper case?

A: Yes.

Q: And your answer would be the same no matter what the facts and circumstances?

A: No matter what.

Q: Okay. In other words, are you telling me you would automatically, in every case, no matter what the facts and circumstances were, always answer these two questions in such a way that the Defendant would get life and not death?

A: Yes.

Q: And that would be in every facts and every circumstances?

A: Yes.

Q: So are you telling me that you could never participate with 11 other jurors and vote in such a way that you would answer these two questions "Yes" and "No" respectively so that the Defendant would get the death penalty? You could never do that, could you?

A: No.

The examination of veniremember Gains is lengthy, yet she holds unequivocally firm to her convictions in opposition of the death penalty. Given veniremember Gains's absolute position in this regard, we hold the trial court did not commit error when it granted the State's challenge for cause without affording appellant the opportunity to question her.

We next examine the record regarding veniremember Denning. Denning made two responses in his juror questionnaire which are relevant to this inquiry. First, he conveyed that he was opposed to capital punishment under all circumstances. Second, he expressed the opinion that he could not vote for the death penalty, regardless of the facts and circumstances of the case. He unequivocally affirmed these beliefs during voir dire. The State, after explaining the effect of the answers to the special issues, asked the following questions:

Q: Now I'm asking you, now that you've seen these two special issues and you know that the result of you answering them "Yes" and "No" would be the imposition of the death penalty, do you have personal, moral or religious scruples against the infliction of the death penalty so that you would answer them in such a fashion the Defendant would get life instead of death?

A: Yes, sir.

Q: And that would be the same regardless of the facts or circumstances, that doesn't matter, does it?

A: Yes, sir, that's true.

Q: Okay. In other words, you're telling me you would automatically, in every case, no matter what the facts or circumstances, answer these two questions in such a fashion that the Defendant would receive life instead of death?

A: Yes, sir, I believe I would.

Q: You need to not answer . . .

A: Yes, sir.

Q: Would you?

A: Yes, I would.

The trial court, in an apparent effort to determine the strength of this veniremember's conviction, interposed:

THE COURT: In other words, when you say, yes, you would, are you positive about that?

PROSECUTOR: That you would always give life?

THE COURT: Or if there is a question about it then you need to tell us there's a question about that.

VENIREMEMBER: Well, I feel certain that yes, I would.

PROSECUTOR: Okay. And that would be regardless of the facts or circumstances?

A: Yes, sir.

Q: One last question. So what you're telling me is that you would never participate—you could never participate with eleven other jurors so as to answer these questions in such a fashion that the Defendant would receive death instead of life?

A: That's true, yes, sir.

\* \* \* \* \* \*

The trial court and the prosecutor engaged in lengthy voir dire examination with veniremember Denning. Yet Denning remained firm and absolute in his conviction; hence, we again hold the trial court did not err in this regard.

Next is veniremember Koneski, who indicated via her responses to the jury questionnaire the following set of beliefs:

> That she was opposed to capital punishment. That she could not vote for the death penalty under any facts or circumstances. That capital punishment could not be regarded as a sane method for dealing with crime. That capital punishment was inappropriate for any kind of crime. That capital punishment is not necessary in modern civilization. That we cannot call ourselves civilized as long as we have capital punishment. That the execution of criminals is a disgrace to civilized society. That life in prison is more effective than capital punishment. And finally that the State cannot teach the sacredness of human life by destroying it.

After unequivocally affirming the preceding beliefs, veniremember Koneski had the following exchange with the State in which she absolutely indicated a significant bias against the law:

> THE STATE: In other words, are you telling me you would automatically, in every case, no matter what the facts and circumstances were, always answer these two questions in such a way that you knew the Defendant would receive life and not death.

> VENIREMEMBER: Right.

Veniremembers Pauwells, Cogswell, Walls, Terry and Ramos adopted Koneski's fervent position, supra, in their own juror questionnaires. Indeed, these veniremembers also unequivocally affirmed their responses to the questionnaires during the voir dire process. Moreover, all maintained that they would distort their answers to the special issues to preclude imposition of the death penalty. There was some variance in the questionnaires from veniremembers Cogswell, Walls and Terry who, while adopting Koneski's earnest position, added that they believed capital punishment to be "the most hideous practice of our time." Given the strength of conviction manifested by these veniremembers and their unequivocal positions during voir dire, we find no error. Points of error sixteen through twenty-three are overruled.

In points eight through fifteen, appellant fashions an argument which again avers error with respect to veniremembers Koneski, Pauwells, Cogswell, Gains, Walls, Terry, Ramos and Denning, supra. Yet in these points, appellant does not propound *Perillo*, supra; rather, appellant alleges that the trial court committed error in *granting* the State's causal strikes against these eight veniremembers. Appellant insists the record fails to support a finding that these potential jurors were disqualified. See *Flores v. State*, 871 S.W.2d 714 (Tex.Cr.App.1993). Appellant's contention in this regard is made irrespective of the trial court's failure to permit appellant to cross-voir dire these veniremembers.

▊ Article 35.16(b)(3) provides the State with a challenge for cause if a venireperson "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." Causal challenges under this Article are matters within the sole discretion of the trial court and will not be disturbed if supported by the record. *Flores v. State*, 871 S.W.2d at 719; *Mooney v. State*, 817 S.W.2d 693, 701 (Tex. Crim.App.1991). This Court will give due deference to the trial court which is in a unique position to measure the venireperson's sincerity, comprehension and demeanor. *Satterwhite v. State*, 858 S.W.2d 412, 415 (Tex.Crim.App.1993); *Mooney v. State*, 817 S.W.2d at 701.

■ The preceding rules of law are typically used in cases with vacillating veniremembers. This Court views the record in its entirety to determine if the trial court could rationally have found a veniremember to be subject to a causal challenge. However, in the instant case, there is no vacillation in the record because appellant was not permitted to question the eight veniremembers at issue. Indeed, the record in this case indicates venirepersons who strongly oppose capital punishment, supra, and these fervent beliefs were not tempered by appellant's rehabilitation because appellant was never permitted the opportunity to rehabilitate. Under this record, we will not find an abuse of discretion since the veniremembers exclusively manifested comprehensive opposition to capital punishment.

In spite of the foregoing, appellant attempts to demonstrate vacillation through an "informal bill of exceptions" under Texas Rule of Appellate Procedure 52(b). At trial, after being denied the opportunity to cross-voir dire these eight veniremembers, appellant alleged through a "bill of exception" what he thought the particular veniremembers would have said to his questions. Appellant apparently surmised that the veniremembers might have been subject to successful rehabilitation and sought to preserve the hypothetical vacillation with this "bill of exceptions." Hence, on appeal appellant argues that this Court must consider the conjectural rehabilitation to determine whether the trial court abused its discretion in striking these veniremembers for cause.

Even assuming, *arguendo,* that appellant's "bill of exceptions" is an appropriate vehicle to preserve conjectural rehabilitation, the trial court did not abuse its discretion in granting a causal challenge to each of these eight veniremembers. If the veniremembers had vacillated in the manner appellant suggests, the trial court could still have granted these causal challenges given the absolute statements that they could never answer the special issues in a manner consistent with a defendant receiving the death penalty. *Riley v. State,* 889 S.W.2d 290 (Tex.Crim.App. 1993); *Montoya v. State,* supra, at 169; *Adanandus v. State,* supra, at 221. We

therefore find no abuse of discretion. Points of error eight through fifteen are overruled.

In point twenty-six, appellant contends the trial court improperly precluded voir dire questioning with respect to parole law in a capital case. Appellant filed a written motion with the trial court specifically requesting leave to inform prospective jurors of the effect of a life sentence vis a vis parole. Appellant apparently sought to determine whether the application of these parole laws—such laws proscribing the parole of a convicted capital defendant until after he has served at least 35–calendar years—would affect the deliberations of the potential jurors. The trial court precluded this stratagem. Appellant insists that the proffered voir dire questions were "proper," hence, the trial court abused its discretion with its prohibition. *Caldwell v. State,* 818 S.W.2d at 793.

■ As discussed, supra, a "proper" question is one which seeks to discover a veniremember's views on an issue applicable the case. *Caldwell v. State,* 818 S.W.2d at 793. If a proper question is disallowed, harm to the appellant is presumed because he has been denied the ability to intelligently exercise his peremptory strikes. *Id.* We have long held that parole is not a matter for jury consideration in a capital murder trial. *Smith v. State,* 898 S.W.2d 838, 846 (Tex. Crim.App.1995) (plurality op.), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995); *Sonnier v. State,* 913 S.W.2d 511 (Tex.Crim.App.1995); *Jones v. State,* 843 S.W.2d 487, 495 (Tex.Crim.App. 1992). Indeed, parole is not a proper topic even in the context of a "future danger" determination because the term "society" as used in this special issue includes both prison and non-prison populations. *Smith v. State,* supra, at 846; *Jones v. State,* supra, at 495. Given that juries are not to consider parole when answering the special issues, we hold that a voir dire inquiry which predicates a parole question with a legal description of the attributes of a life sentence vis a vis parole, is not a proper query. *See Smith v. State,* 898 S.W.2d at 852; *Broxton v. State,* 909 S.W.2d 912, 919 (Tex.Crim.App.1995). Appellant's particular inquiry is not a "proper" question because the nature of parole in a capital

case—a matter which is wholly inappropriate for jury deliberation—logically is not an "issue applicable to the case."[11] Thus the trial court did not commit error when it precluded appellant from informing the venire panel of the effect of a life sentence as it pertained to parole. Point of error twenty-six is overruled.

In point thirty-two appellant alleges error because the trial court permitted twenty uniformed state troopers and police officers to attend, as spectators, final jury argument for the penalty phase of the trial. Appellant insists that his right to fundamental fairness, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, was violated.

▆▆▆▆ The Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried by impartial, indifferent jurors whose verdict must be based upon the evidence developed at trial. *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). A defendant, to prevail on an appeal claiming reversible prejudice resulting from external juror influence, must show either actual or inherent prejudice. To determine inherent prejudice, we look to whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. at 570, 106 S.Ct. at 1346–47 (citing *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)). Obviously, the test to determine actual prejudice—the result of external juror influence—would be whether jurors actually articulated a consciousness of some prejudicial effect.[12] The Eleventh Circuit has argued persuasively that inherent prejudice rarely occurs and "is reserved for extreme situations," *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir.

1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989), and we so hold. We have long held that spectator conduct or expression which impeded normal trial proceedings would not result in reversible error unless an appellant showed a reasonable probability that the conduct or expression interfered with the jury's verdict. *Landry v. State*, 706 S.W.2d 105, 112 (Tex.Crim.App. 1985); *Ashley v. State*, 362 S.W.2d 847 (Tex. Crim.App.1962). The federal test and the test articulated by this Court are essentially interchangeable.

The record with respect to what actually occurred in the trial court is quite sparse. When appellant objected to the presence of the uniformed peace officers, the trial court took judicial notice of the courtroom presence of twenty uniformed officers. The trial court also noted that the officers were spectators and that they were in the back of the courtroom. The prosecutor had the trial court take notice of the presence of eighty-one other "civilians" distributed throughout the courtroom. This is the entirety of the record as it pertains to appellant's objection at trial. Appellant makes various contentions in his brief regarding the nature of this official presence.[13] However, appellant did not request judicial notice of his contentions or object to alleged prosecutorial improprieties with respect to the presence of the peace officers. Appellant does not claim the peace officers actively conducted themselves in a manner which prejudiced his opportunity to receive a fair trial. Appellant objected only to their presence and any message such a presence might entail. Thus, this Court has as a basis for its review only the *presence* of twenty uniformed officers, sitting near the back of the courtroom, mingled with 80 other spectators. Appellant would have this Court

---

**11.** This Court has recognized counsel's right to examine each prospective juror regarding whether each can obey an instruction forbidding the consideration of parole in punishment deliberations. *Jackson v. State*, 822 S.W.2d 18, 27 (Tex. Crim.App.1990), cert. denied, 509 U.S. 921, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993).

**12.** Appellant does not here make an effective argument for actual prejudice. At no time were jurors questioned regarding their conscious perception of impermissible external influence.

**13.** For instance, appellant insists in his brief that the officers were armed. However, the record does not reflect such a claim and we are unable to make such a determination. In addition, appellant claims in his brief that the prosecutor made references to the peace officers during penalty argument, yet again, appellant failed to have the record reflect such a charge, and this Court cannot assume that such conduct occurred.

declare reversible error, per se, based merely on these facts.

We fail to see, from this record, how the presence of these officers resulted in inherent prejudice such that it could be deemed to inherently lack due process. Appellant simply fails to provide any support for his claim of error relying only on the following unsupported assertion:

Their presence, invoked repeatedly during the prosecutor's summation to the jury, was intended to communicate an inflammatory message—that the jurors, by their punishment phase verdict, were somehow passing judgment on the worth of Trooper Davidson's life and, more importantly, on the dedication and sacrifice of his colleagues in uniform. *This message could have only been intended, and no doubt ultimately did, influence the jury in its eventual decision to impose the death penalty.* (emphasis added).

In this conclusory argument, appellant identifies the prosecutor's valid plea for law enforcement made during argument. In an effort to establish prejudice, appellant emphasizes this plea and conjoins it with prosecutorial references to the presence of the 20 officers. Thus, appellant strives to advance the law enforcement plea as the source of inherent prejudice. Yet this Court cannot hold that the mute and distant presence of twenty peace officers—comprising roughly one-fifth of the spectator gallery—is prejudicial, per se, without some other indication of prejudice. We have condoned the presence of crime-victims during trials. *Landry v. State,* supra, at 112. The presence of a victim's family—in an effort to show solidarity or support with the victim—is alone not enough to establish a reasonable likelihood of prejudice.

■ If the record at bar indicated some overt conduct or expression, or perhaps a higher ratio of police officers, or even perhaps some indication that the law-enforcement contingency gravitated toward the jury, then there might be some basis for appellant's argument.[14] Yet none of these considerations are present. We will not lightly assume the jury disregarded its instructions and rendered a verdict based upon the presence of these peace officers alone.[15] Under the federal test, we find there was not an unacceptable risk of an impermissible factor coming into play. Under the test enunciated in *Landry,* supra, we find there was no reasonable probability that an external influence interfered with the jury's verdict. Under either test, the statement of facts is too scant to make a case for inherent prejudice. Point of error thirty-two is overruled.

In point thirty-three appellant cites the Texas Constitution, again claiming error due to the presence of these twenty uniformed police officers and troopers. We note that this Court has analyzed spectator conduct under the test provided in *Landry,* supra, and we have done so in this instance, finding no violation of appellant's rights. This Court has never considered our own analysis under *Landry* to be a violation of the Texas Constitution. Appellant, in this context, proffers very little argument or authority supporting his claim for heightened state constitutional protection. Appellant merely highlights the disjunctive difference between the Eighth Amendment "cruel *and* unusual" provision under the Federal Constitution, and the Arti-

---

14. This opinion should not be interpreted to give carte blanche approval to police officer-spectators in a courtroom. Here, the officers and troopers attended only after the appellant had been convicted of capital murder. Indeed, the officers had a reason to attend given the identity of the victim. Their attendance appears limited and their presence did not overwhelm the composition of the spectator gallery. Trial courts must carefully determine the risk and probability of prejudice in this context.

15. But *See, Woods v. Dugger,* 923 F.2d 1454 (11th Cir.1991), where the eleventh circuit found the presence of spectator prison-guards (the defendant was charged with killing a prison guard) to create an unacceptable risk of impermissible factors coming into play and prejudicing the jury. Although appellant claims that *Woods* is indistinguishable from the case at bar, the facts of *Woods* establish a much greater chance of prejudice: The prison existed in a rural area and apparently comprised a significant proportion of the local economy. *Id.* at 1458. Moreover, of the jurors who actually served on the jury, seven had either worked in the prison system themselves or had relatives currently working in the prison system. *Id.* Under such circumstances, a much greater risk of impermissible factors prejudicing the jury is present.

cle I, § 13 "cruel *or* unusual" standard in the state constitution. Appellant advances this difference as the basis for a holding in his favor. However, the federal right implicated by appellant in this regard is his right to a fair and impartial trial, protected by the *sixth* and fourteenth amendments. *Holbrook v. Flynn*, 475 U.S. at 567, 106 S.Ct. at 1345. The eighth amendment's "cruel and unusual" provision has no function in this setting. More important, the analogous Texas constitutional provision—the right to a fair and impartial jury—derives from Article I, § 10, not Article I, § 13. We decline to interpret the Texas "cruel or unusual" provision of Article I § 13 to extend heightened protection in this context. Appellant tenders no further argument or authority as to the "heightened" protection provided by the state constitution; his claim is therefore inadequately briefed and presents nothing further for our review. Tex.R.App.Proc. 74(f) and 210(b); *Ex parte Granger*, 850 S.W.2d 513, 515, fn. 6 (Tex.Crim.App.1993). Point number thirty-three is overruled.

In appellant's thirty-first point, he avers the trial court committed error when it failed to instruct the jury—over appellant's objection—on the burden of proof with respect to mitigation, the second special punishment issue. Appellant discerns two legal deficiencies with such an omission. First, appellant contends this Court would be unable to review the jury's mitigation resolution without a standard of proof against which to judge the sufficiency of the evidence. Appellant insists this Court would unconstitutionally abdicate its appellate role in a capital case if we did not judge the sufficiency of mitigating evidence. Second, appellant contends the jury had no guidance in its deliberative process. Without such guidance, appellant argues the jury may have erroneously assumed the *defendant* had to prove the existence of mitigation beyond a reasonable doubt. Appellant is incorrect in both allegations.

 No burden of proof exists for either the State or defendant to prove or disprove the mitigating evidence. *Barnes v. State*, 876 S.W.2d 316, 330 (Tex.Crim.App.

1994), cert. denied, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Although technically a "factual question," the mitigation issue is in reality a normative determination left to the subjective conscience of each juror. Article 37.071 does not objectively define "mitigating evidence," leaving all such resolutions to the subjective standards of the jury. *Banda v. State*, 890 S.W.2d 42, 54 (Tex.Crim.App.1994), cert. denied, —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995). We will defer to the jury's determinations respecting the existence or non-existence of mitigating circumstances sufficient to militate against application of the death penalty in a given case. In addition, we have held that the Federal Constitution does not require this Court to undertake the impossible task of reviewing the sufficiency of a mitigation determination.[16] *Hughes v. State*, 897 S.W.2d 285, 294 (Tex.Crim.App.1994). Given our consistent holdings in this context, appellant's contention that this Court has unconstitutionally abdicated its appellate role in a capital case is erroneous.

However, appellant also suggests that, in the absence of an instruction to the contrary, a jury might believe the burden to be on the defendant to prove the existence of mitigation beyond a reasonable doubt. Hence, an individual juror could subjectively find the existence of mitigation and yet answer the special issue in the negative due to an erroneous belief that the law required a higher standard of proof than would the individual juror. Nevertheless, appellant's objection and point of error in this regard is not apparent. At trial appellant sought, by his objection to the jury charge, to place the burden on the State to prove the nonexistence of mitigating circumstances beyond a reasonable doubt:

APPELLANT: Our next objection to the charge, Your Honor, we ask that there be included, as with Special Issue Number 2, a burden of proof to guide the jurors as to what the burden is. And we would request that the burden of proof be beyond a reasonable doubt on the State of Texas that they must disprove sufficiency of miti-

---

**16.** The appellant here does not argue that his state constitutional rights were violated. Hence we only address the appellant's federal constitutional rights.

gating circumstances. We feel that the statute as it is in the charge provides the juror with no guidance in answering these questions and to solve this riddle the juror is left to his own personal moral beliefs. The Code's failure to properly place the burden of persuasion regarding mitigation is that the death penalty will be applied arbitrarily, inconsistently and without clear preventative measures to narrow the class of persons eligible for the penalty of death. The 8th Amendment, as it relates to capital murder, stands for the principle that juries in death penalty cases must be constrained by specific standards so that the death penalty is not inflicted in a random and capricious fashion. We believe that, and we request that the Court, as to Special Issue Number 2, place the burden on the State of Texas of disproving the sufficiency of mitigating evidence.

The thrust of this objection is an allegation of error because the charge "fail[s] to properly place the burden of persuasion regarding mitigation...." In his brief on appeal, appellant again contends error because the trial court failed to provide the jury with any instruction as to the burden of proof (or, indeed, a standard of proof). Appellant, by this argument, seems to propound that an instruction as to the burden of proof on the mitigation special issue must be placed to avert juror confusion. He is incorrect. As we expressed, supra, Texas law does not place such a burden on either the State or the defendant. *Barnes v. State*, supra, at 330. The solution to appellant's perception of speculative juror confusion cannot be to provide an inaccurate legal instruction and erroneously place the burden or standard of proof on the State or defendant. As stated, supra, the federal constitution does not require such an instruction assigning a burden of proof on the mitigation special issue. Hence, the trial court did not err by refusing to give such an instruction. Indeed, the trial court would have erred if it had placed the burden of proof on one side or the other.[17] Appellant's thirty-first point of error is overruled.

In point of error number thirty-four, appellant propounds error because the trial court instructed the jury to consider, for the purpose of determining the existence of mitigation, only that evidence which rendered the appellant morally less blameworthy. Appellant contends that the ambiguous language of the charge rendered this otherwise permissible instruction confusing. The jurors might have interpreted the charge, appellant insists, to mean that they were *only* to consider evidence which "rendered the appellant morally less blameworthy" when they answered *both* Special Issue Two *and* Special Issue One. Thus, appellant contends the jury was not permitted to consider evidence of his good disciplinary record while incarcerated after arrest under Special Issue One because such evidence did not render the appellant "less blameworthy." In this regard appellant maintains a violation of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant is incorrect.

■ A jury, under the Texas special issue framework, can generally give effect to a defendant's good disciplinary record while in prison by means of the first special issue. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). If, however, a specific jury charge does not permit the jury to consider such evidence, an Eighth Amendment violation may be present. *Franklin v. Lynaugh*, 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., concurring). In this instance, the charge was not confusing; hence, the jury did have a vehicle by which to express its "reasoned moral response" to appellant's proffered evidence.

■ The trial court's charge contained two paragraphs which form the essence of appellant's contention, viz:

In determining your answers to the questions, or special issues, submitted to you, you shall consider *all evidence admitted at the Guilt or Innocence stage and the Punishment stage, including* evidence of the Defendant's background or character or the circumstances of the offense that mili-

---

17. If however, appellant is contending by this argument that the trial court should have instructed the jury that *there was no burden of*

*proof on either party,* then such objection was neither preserved for appeal nor presented in appellant's brief.

tates for or mitigates against the imposition of the death penalty. (emphasis added)

You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror might regard as reducing the Defendant's moral blameworthiness.[18]

Appellant's assertion is unsupported. The trial court never limited the jury's Special Issue One cogitation to evidence which only diminished appellant's moral blameworthiness. The jury was directed to consider *all evidence* when answering the special issues, *including, but not limited to,* mitigating evidence. Thus, when the charge subsequently defines mitigating evidence, as it pertains to Special Issue Two, it *does not* limit the jury considerations to only "moral blame" when the panel resolves the first special issue. The jury was free to consider appellant's good conduct in jail while incarcerated for this crime in its determination of appellant's likelihood to commit continuing acts of violence. Appellant's thirty-fourth point is overruled.

In points of error numbers twenty-seven through twenty-nine, appellant maintains the trial court committed error when it refused to terminate the punishment phase—and enter a life sentence—after the jury indicated that it had reached a deadlock. Appellant made three separate motions for mistrial, such motions occurring after three distinct jury deadlock notes, corresponding to points twenty-seven through twenty-nine respectively. We will review each motion, and the facts surrounding them, in turn, to determine if the trial court erred in refusing to enter a mistrial.

▋ Article 37.071, § 2(e) compels the trial court to enter a life sentence if the jury is unable to answer any special issue. *Montoya v. State,* 810 S.W.2d 160, 166 (Tex.Crim. App.1989). However, the trial court is not constrained to enter a life sentence after the first sign of juror impasse. Rather, the court may do so if it determines, in its discretion, that the jury has been kept together for such a time as to render it altogether improbable

that it can agree. Article 36.31. As we observed in *Montoya:*

> Length of time that the jury may be held for deliberation rests in the discretion of the trial judge. Unless the record reveals that the trial court abused its discretion in holding the jury for deliberations, reversal is not mandated. *Montoya v. State,* 810 S.W.2d at 166.

There is no set time limit for jury deliberation. *Green v. State,* 840 S.W.2d 394, 407 (Tex.Crim.App.1992). When reviewing the trial court's discretion in this regard, this Court will consider the sheer length of the trial and amount of evidence presented to the jury. *Id.*

A careful discussion of the record in this case is imperative. On July 8, 1993, at 5:30 p.m., the jury, after hearing punishment argument, retired and began its deliberations. At 6:15 p.m., the same day, the jury indicated via a note that it would "need more time, possibly considerable, to make a decision in this case." The jury recessed that day at 6:35 p.m. On July 9, the next day, the jury began its deliberations at 8:30 a.m. At 10:40 a.m., the jury requested a transcript of appellant's punishment testimony. At 5:15 p.m., the jury requested information regarding whether certain letters and diary entries were admitted into evidence. At 6:30 p.m., the jury, prior to the overnight recess, sent a note which indicated that it had been deadlocked most of the day. The jury foreperson wrote that they were deadlocked "at 10 yes and 2 no votes on Special Issue Number 1." Until this point, the jury had deliberated slightly more than a day, perhaps eight hours. Appellant moved for a mistrial, arguing deadlock and seeking the entry of a life-sentence. The trial court overruled the motion.

▋ The trial court is not bound to declare mistrial at the first sign of jury impasse. Here, the jury had deliberated for a period of perhaps eight hours, possibly less. This trial involved a great deal of evidence: 157 witnesses and 305 exhibits, presented during nineteen days of trial testimony. The jury requested transcript information and in-

---

**18.** We note that these charges are essentially identical to those endorsed in 8 McCormick,

Blackwell and Blackwell, *Texas Practice, Criminal Forms and Trial Manual* § 98.19.

quired about other evidence. Such conduct rationally indicated ongoing deliberation. We do not find the trial court abused its discretion when it denied appellant's first request for mistrial. Point of error twenty-seven is overruled.

■ On July 10, the jury again began its deliberation at 8:30 a.m. The day was interrupted at 9:30 a.m., when testimony regarding correspondence appellant wrote while in jail was read to the jury. The day was then uneventful until 5:45 p.m., when the jury foreperson sent a note indicating: "This jury has been hopelessly deadlocked with 10 no votes against 2 yes votes since 11 o'clock this morning on Issue 2. Can you give us some guidance on how to solve this issue?" Appellant moved for a mistrial and the entry of an obligatory life sentence. This motion was denied and is the basis of point of error number twenty-eight. The clarifying aspect of this second note is that the jury had now begun its deliberation on *Issue Two*. The first note indicated deadlock on *Issue One*. The jury was instructed that it was to answer Special Issue Two *after* it affirmatively found Special Issue One. Article 37.071 § 2(e). With no indication that the jury disregarded its instruction, the trial court could reasonably have concluded the jury unanimously answered special Issue One in the affirmative. The jury did appear to be making deliberative progress. Indeed, the trial court could rationally have concluded the jury affirmatively answered Special Issue One at 11:00 a.m. that same day, given the time provided in the second note. Hence, the jury would have been deliberating Special Issue Two from 11:00 a.m., until 6:00 p.m., perhaps six hours. The trial court responded to this second note: "The only guidance I can give you at this time is contained in the written charge which has been delivered to you. Please continue your deliberations." Given the amount of evidence, the appearance of deliberative breakthrough, and the seeming short period of "deadlock" with respect to this second issue, we do not find an abuse of discretion. Point of error twenty-eight is overruled.

The jury returned for deliberation on July 11, at 8:30 a.m. At 4:00 p.m., the jury requested an explanation of the term "blameworthiness," in the following note:

> In your instructions to the jury where you defined "mitigating evidence" on Page 3 Chapter 6, last word of the first sentence, you used the word "blameworthiness". We have considerable disagreement as to the meaning of this word. Can you explain this to us in layman's terms.

The trial court then provided some guidance. This particular request was again indicative of productive deliberation because the jury was still debating the application of the charge to the facts. The jury recessed at 6:15 p.m.

On July 12, the jury began to deliberate at 8:30 a.m. The jury did not exhibit deadlock and made no contact with the trial court. It recessed at 5:30 p.m. The next day, July 13, the jury began deliberation at 8:55 a.m. At 11:10 a.m. the jury sent the following note:

> Issue Number 2. After several days careful deliberation, this jury is still hopelessly deadlocked with 10 no votes and 2 yes votes. I strongly feel that any further deliberation will not change this final vote.

Appellant again moved for mistrial and the trial court overruled. This third note provides an interesting insight. It demonstrates that the jury had been involved in "careful deliberation" in the days immediately prior. This jury was not at a deliberative standstill but was actively and carefully considering all the relevant evidence. Such a process exactly encompasses a jury's role in our legal system. At 11:20 a.m., to further encourage dialectic, the trial court provided a supplemental instruction via an *"Allen* charge." *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The jury continued deliberation until it recessed at 6:00 p.m. The jury returned a verdict at 9:50 a.m. the next day, July 14.

■ We do not find the denial of the third mistrial motion to be an abuse of discretion. Until the third deadlock note, the trial court could rationally have found the jury to be actively and successfully involved in its deliberative process. We are mindful, however, that with the third note, received July 13, at 11:10 a.m., the trial court ap-

proached the limit of its discretion. Additional lengthy deliberation might have become oppressive and coercive. Yet the jury returned its verdict within roughly seven hours of this final deadlock note. While this time-interval began to approach the trial court's permissible range of discretion, given the context of the deliberations to that point, we do not find an abuse of discretion in this case. Point of error twenty-nine is overruled.

In point of error thirty, appellant contends the trial court erred when it gave an *"Allen"* charge after the jury exhibited deadlock as to the punishment issues, and where such supplemental instruction tended to coerce the jurors into a verdict. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Appellant in his brief relies on federal case law to establish his claim for constitutional violation and reversal.[19] We find no error.

 The use of a supplemental charge in this context has long been sanctioned by both this Court and the United States Supreme Court. *Id; Arrevalo v. State,* 489 S.W.2d 569 (Tex.Crim.App.1973). The primary inquiry to determine the propriety of an Allen or "dynamite" charge is its coercive effect on juror deliberation, "in its context and under all circumstances." *Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 550, 98 L.Ed.2d 568 (1988) (quoting *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965)). In examining a coercive claim, we must be mindful of the calculus of *Allen,* viz:

The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the

case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself. *Allen v. United States,* 164 U.S. at 501–02, 17 S.Ct. at 157.

The Supreme Court has re-affirmed the legitimacy of *Allen* and has commented that the preceding "observations are beyond dispute, and they apply with even greater force in a case such as this, where the charge given, in contrast to the so-called 'traditional *Allen* charge,' does not speak specifically to the minority jurors." *Lowenfield v. Phelps,* 484 U.S. at 237–238, 108 S.Ct. at 551. Thus, a supplemental charge which suggests that *all* jurors reevaluate their opinions in the face of disparate viewpoints cannot be said to be coercive on its face.

 In the case at bar, the trial court gave the following supplemental charge to the jury:

Ladies and Gentlemen of the Jury: You have heard several weeks of testimony in this cause and a considerable amount of time and effort has been expended in bringing this evidence before you. Careful consideration of all such evidence might take quite a bit of your time. When you arrive in the jury room it is your duty to consult with one another, to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to individual judgment. Each of you must decide the case for yourself but only after discussion and impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your own views and to change your opinion if you are wrong, but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

With these additional instructions you are requested to deliberate in an effort to arrive at a verdict that is acceptable to all members of the jury if you can do so without doing violence to your conscience.

**19.** Appellant cites a single Texas case, *Montoya v. State,* 810 S.W.2d 160 (Tex.Crim.App.1989), in support of his bid for reversal in this case. However, *Montoya* is barely relevant to appellant's contention in this regard and simply acknowledges *Allen,* supra.

Do not violate your conscience but continue to deliberate.

The trial court in this instance did not directly address the minority jurors and did not shade the instruction with coercive nuance. Rather, the trial court simply directed the jurors to debate the issue in good faith, to reconsider their own views and to change such views only if this could be done without violence to the juror's individual conscience. Such an instruction serves to encourage dialectic and to avert an impasse. We do not find coercive suggestions in the instruction given in the instant case.

Moreover, the Supreme Court approved a similar instruction in its review of an *Allen* charge given in a Louisiana capital case.[20] We find the supplemental charge at bar to be, in relevant portions, analogous to that ratified in *Lowenfield v. Phelps,* 484 U.S. at 235, 108 S.Ct. at 549–50.

Nevertheless, appellant insists the trial court committed error when it furnished the *Allen* charge while cognizant of the numerical division of the deadlocked jury. *See United States v. Sae–Chua,* 725 F.2d 530 (9th Cir.1984). In the instant case, in the period of deliberation prior to the Allen charge, the jury foreperson had informed the trial court of the numerical division of the jury.[21] Appellant contends that under federal case law, the possession of such information makes an Allen charge coercive. Appellant's reliance upon *Sae–Chua* is misplaced. In *Sae–Chua* the Ninth Circuit, citing *Brasfield v. United States,* 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), found reversible

error when the trial court polled a deadlocked jury regarding the likelihood further deliberations would have in achieving a verdict. The U.S. Supreme Court in *Brasfield* created a prophylactic rule forbidding the federal trial courts from questioning their juries regarding numerical division. *Id.* However, such a prophylactic rule is based upon the U.S. Supreme Court's exercise of supervisory powers and not upon any notion of constitutional infraction. *Lowenfield v. Phelps,* 484 U.S. at 239–249 n. 3, 108 S.Ct. at 551–57 n. 3. The prophylactic rule present in *Brasfield* and *Sae–Chua,* supra, simply has no application to this state proceeding or this Court's holding.

We are mindful that in some contexts, a trial court might engender coercion by actively identifying jurors with minority viewpoints and tacitly instructing them to reexamine their perspectives. However, in the case at bar, the trial court did not probe the jury or attempt to identify the minority jurors. The trial court's information as to numeric division was an unsolicited and extraneous reference in a note from the jury. In this context we find the *Allen* charge to be noncoercive.

■■■ Appellant finally contends in this regard that the supplemental charge at issue was coercive in its "context" because the jury might erroneously assume that failure to agree would result in an entirely new trial. Appellant reasons that such an assumption, in conjunction with this Allen charge, pressured the jury to arrive at a verdict to avoid the time and expense of a new trial.[22] Appel-

**20.** That instruction follows:

Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine you own views and to change your opinion if you are convinced you are wrong but do not surrender your honest

belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. *Lowenfield v. Phelps,* 484 U.S. at 235, 108 S.Ct. at 549.

**21.** The judge did not solicit the numerical breakdown of the jury. Rather, the jury provided this information in its notes to the trial court.

**22.** Appellant apparently suggests a requirement that the trial court inform the jury that the court would impose a life sentence if the jury was unable to achieve a unanimous result. However, such a position was neither raised at trial nor briefed for this appeal. Indeed Article 37.071 § 2 prohibits the trial court from providing such information to the jury.

lant misconstrues the law in this circumstance and would frustrate the very purpose behind a constitutionally permissive *Allen* charge. The law places upon the jury a statutory duty to deliberate and answer the special punishment issues. *Patrick v. State,* 906 S.W.2d 481, 494 (Tex.Crim.App.1995). An *Allen* charge is designed to foster or "coerce" this debate and to *circumvent a mistrial. Allen v. United States,* supra, at 501, 17 S.Ct. at 157. Texas law should not be construed to *favor* a mistrial by informing the jury, via an *Allen* charge, that the trial court will "take over" and impose a life sentence as soon as deliberations become difficult. Such an instruction would effectively negate the "coercive" nature of an Allen charge and encourage jurors to discontinue deliberation, contradicting the thrust of the supplemental charge. Appellant's argument is akin to expounding that any procedure which does not favor the imposition of a life sentence is coercive. Such a one-sided interpretation of the law is insupportable. In this regard, we hold that the *Allen* charge was not coercive. Point of error thirty is overruled.

Having found no reversible error, we AFFIRM the judgment of the trial court.

OVERSTREET, J., dissents.

OVERSTREET, Justice, dissenting.

This case presents a *Garrett* problem. *Garrett v. State,* 851 S.W.2d 853 (Tex.Crim. App.1993). Where the State challenges a veniremember for cause and the trial court erroneously grants the challenge under *Garrett,* this Court has no choice but to reverse the case.

In his first point of error, appellant argues that the trial court erred in granting the State's challenge for cause against veniremember Durling. During voir dire, Durling stated that she would require the State to prove a prior murder before she could find a defendant to be a future danger under the first special issue. The majority believes that this requirement adds an additional element to the State's burden at trial. *Majority* op. at 112. Relying on this Court's plurality opinion in *Rachal v. State,* 917 S.W.2d 799

(Tex.Crim.App.1996), the majority states that "potential jurors must be able to set aside their personal preferences and biases to consider death eligible *all those defined as death eligible*" under the law. The majority concludes that "[s]ince veniremember Durling unequivocally stated an unwillingness to set aside her view regarding death eligibility— such definition adding to the Article 37.071 statutory definition of those eligible for the death sentence in Texas—she possessed a bias against that law" and was, therefore, properly dismissed from the jury panel. *Majority* op. at 112.

In point of error twenty-four, appellant argues the trial court erred in granting the State's challenge for cause against veniremember Ochoa. Ochoa agreed that violent illegal acts directed toward property were "criminal acts of violence that would constitute a continuing threat to society" under the first special issue. However, Ochoa stated that she would not answer the first special issue in the affirmative unless the State proved an act of violence directed toward people. The majority finds that "[t]he effect of this belief is that even if this veniremember believed, beyond a reasonable doubt, that a defendant presented a continuing threat to society, by virtue of a propensity to commit violent acts directed toward property, she would never answer Special Issue One 'Yes' unless the State met her personal dictates." Again relying on *Rachal,* the majority states that Ochoa substituted the statutory definition of those eligible for death with her "personal preferences and biases." *Majority* op. at 112.

Both of these points of error are governed by *Garrett.* In *Garrett,* the defendant argued the trial court erred in granting the State's challenge for cause against a veniremember who indicated that he could never answer the future dangerousness special issue "yes" based solely on the facts of the capital crime itself. We concluded that the refusal to find that a defendant would constitute a future danger based solely on the facts of the case did not amount to a bias against the law. This Court reasoned:

[T]hat the law permits jurors to find future dangerousness in some cases on the facts

of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite.

*Garrett*, 851 S.W.2d at 859; *see Castillo v. State*, 913 S.W.2d 529, 533 (Tex.Crim.App. 1995) (plurality opinion). We held "that a venireman is not subject to challenge for cause merely because he indicates that he would require more evidence than the legal minimum in order to answer special issue two affirmatively." *Garrett*, 851 S.W.2d at 860.

The principle of *Garrett* applies here. Durling required proof that a defendant committed a prior murder and Ochoa required proof that "criminal acts of violence" be committed against people before either of them would answer the first special issue "yes." "If they meant that, absent a particular character of evidence, they would have a reasonable doubt whether an accused would constitute a continuing threat to society, then they have not proven themselves subject to a challenge for cause." *Rachal*, 917 S.W.2d at 820 (Clinton, J., concurring). Durling and Ochoa were not challengeable for cause because they did not indicate that they would not answer the special issue affirmatively absent the State's proof of specific evidence, *even if, without that evidence, they believed beyond a reasonable doubt* that appellant would constitute a future danger to society.

The challenging party has the burden to demonstrate that the veniremember he seeks to challenge is in fact incapable of following the law. *Hernandez v. State*, 757 S.W.2d 744, 753 (Tex.Crim.App.1988) (plurality opinion), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). In order to sustain a State's challenge for cause on the ground that a veniremember will not find future dangerousness absent specific evidence, the State must show the trial court that the venireman's categorical refusal is predicated upon something other than his understanding of what constitutes proof beyond a reasonable doubt. *Castillo*, 913 S.W.2d at 534 (plurality opinion). In the context of this case, the State needed to demonstrate that Durling and Ochoa, absent certain types of evidence, would answer the first special issue "no," even if they believed beyond a reasonable doubt that the defendant presented a future danger. Because the State has not done so, it has failed to sustain its burden to show these veniremembers could not follow the law.

Because the majority holds veniremembers Durling and Ochoa were challengeable for cause, I respectfully dissent.

CLINTON and BAIRD, JJ., join.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

CLINTON, Judge.

We granted rehearing in this cause in order to re-examine appellant's points of error one and twenty-four, whereby he contended the trial court erred in granting State's challenges for cause against veniremen Durling and Ochoa, respectively. Appellant contends that our disposition of these points of error on original submission conflicts with our holding in *Garrett v. State*, 851 S.W.2d 853 (Tex.Cr.App.1993). On closer scrutiny we reaffirm our conclusion that the trial court did not err in granting the State's challenge for cause against venireman Ochoa. However, we conclude that the State failed to sustain its burden to establish venireman Durling was challengeable for cause, and that the trial court erred to grant the State's challenge against her. Accordingly, we will vacate the judgment of the trial court and remand the cause for a new punishment proceeding. Article 44.29(c), V.A.C.C.P.; *Ransom v. State*, 920 S.W.2d 288 (Tex.Cr.App. 1996) (Opinion on State's motion for rehearing).

Venireman Ochoa made it clear that she believed that crimes of destruction against property constitute "criminal acts of violence" for purposes of the special issue in Article 37.071, Section 2(b)(1). But she asserted that even if evidence of such crimes against property convinced her that appellant

would "constitute a continuing threat to society," she could not bring herself to answer the special issue in such a way as to permit imposition of the death penalty. Thus she proved herself to be analogous to the hypothetical venireman we discussed in our plurality opinion in *Castillo v. State*, 913 S.W.2d 529, at 533–34 (Tex.Cr.App.1995). There we declared that a venireman who refuses to convict an accused on the basis of a single witness' testimony, even if that witness' testimony convince him beyond a reasonable doubt of the accused's guilt, was properly challengeable for cause for harboring a bias against a phase of the law upon which the State is entitled to rely. Article 35.16(b)(3), V.A.C.C.P. Similarly, venireman Ochoa maintained that, even if the evidence convinced her appellant would commit future acts of violence constituting a continuing threat to society, she would not answer the special issue affirmatively if the evidence that so convinced her was comprised solely of offenses against property. As with the hypothetical venireman in *Castillo*, Ochoa thus would require the State to prove something different than the law requires. She betrayed "an agenda of [her] own for [answering the special issue], but one which bears no relation to the law." *Id.*, at 533–34. At one point appellant's counsel was able to persuade Ochoa that she might be willing to affirmatively answer the special issue on the basis of property offenses alone, but only on the assumption that such offenses would cause at least psychological damage to people. On further questioning by the prosecutor, however, Ochoa returned to her categorical assertion she could never answer the special issue favorably to the State on the basis of property crimes alone, even if that evidence served to convince her appellant

would commit future acts of criminal violence that would constitute a continuing threat to society. In the face of this vacillation, we defer to the trial court's judgment that Ochoa was substantially impaired in her ability to follow the law. *Perillo v. State*, 758 S.W.2d 567, at 577 (Tex.Cr.App.1988). For these reasons we were correct to conclude on original submission that the trial court did not abuse its discretion in granting the State's challenge for cause against venireman Ochoa.[1]

Venireman Durling, however, is another matter. True, she asserted that she could never answer the future dangerousness issue in the affirmative without evidence the accused had committed a prior murder. But the State did not ask Durling whether she would refuse to answer "yes" *sans* a prior murder even if other evidence were sufficient to convince her beyond a reasonable doubt (or to any level of confidence) that appellant would commit future acts of violence that would constitute a continuing threat to society. Thus the record does not disclose whether or not Durling's assertion was merely a prediction that without evidence of a prior murder she would not likely be convinced of future dangerousness beyond a reasonable doubt, or a categorical refusal to answer "yes" even if other evidence could convince her of appellant's future dangerousness to that level of confidence. Only in the latter even that she shown herself susceptible to a challenge for cause. It is the State's burden, as the challenging party, to show that Durling's refusal "is predicated upon something other than [her] understanding of proof beyond a reasonable doubt." *Castillo v. State*, *supra*, at 534. Because the State did not satisfy that burden here, the trial

1. Ochoa did not say, and the State did not ask her, whether she would be unable to answer the future dangerous special issue "yes" on the basis of property crimes alone even if those crimes convinced her *beyond a reasonable doubt* that appellant would commit criminal acts of violence that would constitute a continuing threat to society. There remains, therefore, perhaps a remote chance that Ochoa's inability to answer the special issue affirmatively was predicated upon her personal threshold of reasonable doubt. Such a venireman is not challengeable for cause. *Garrett v. State*, *supra*, at 859; *Castillo v. State*,

supra, at 533. We think the State's questioning was specific enough, however, to justify a trial court's inference that the venireman would be substantially impaired. That she would not answer "yes" to the future dangerousness issue even if convinced to some unspecified level of confidence that appellant would constitute a continuing threat to society is enough to support the conclusion that there is a substantial likelihood she would "balk" at the task of honestly answering the question, irrespective of the applicable level of confidence. See *Riley v. State*, *supra*, at 301.

court abused its discretion to grant the State's challenge against Durling.

On original submission the Court found "instructive" our recent plurality opinion in *Rachal v. State*, 917 S.W.2d 799 (Tex.Cr.App. 1996). There the plurality "reaffirmed" earlier holdings that:

> "potential jurors must be able to set aside their personal preferences and biases to consider as death eligible *all those defined as death eligible* by Section 19.03 of the Texas Penal Code and Article 37.071 of the Texas Code of Criminal Procedure. Potential jurors may believe what they want regarding the death penalty, including the quantum of evidence they will require to impose a death sentence. But, jurors may not substitute legal categories of death eligibility with their personal preferences and biases and thereby place themselves above the law."

*Id.*, at 812–13 (footnotes and citations omitted). The *Rachal* plurality relied in large measure on *Fuller v. State*, 829 S.W.2d 191, at 200 (Tex.Cr.App.1992), for this proposition that potential jurors must be able to accept the law's definition of death eligibility. It is certainly true, as both *Rachal* and *Fuller* suggest, that a venireman who says he would never, for example, vote to convict an accused of capital murder because he does not accept murder in the course of a burglary as a valid criteria for a sentence of death, notwithstanding Section 19.03(a)(2) of the Penal Code, has demonstrated himself to be challengeable for cause. But the reason he is challengeable is not *per se* his inability to accept the law's criteria for death eligibility in the abstract. He is challengeable, rather, because he is likely to pay heed to his own conception of what the law ought to be rather than follow the legal criteria. Plainly put, his disagreement with the law will prevent him from following it. That appears to have been the case in *Fuller*, where the venireman indicated she could only assess the death penalty for serial killers.[2] It was unquestionably the case in *Rachal*, where the veniremen testified, much like venireman Ochoa in the instant case, that they could never answer special issues affirmatively absent a particular character of evidence, even if other evidence convinced them beyond a reasonable doubt the special issues should be answered "yes."

▬▬▬ But disagreement with the legal criteria for death eligibility, without a further showing of consequent inability to follow the law, will not suffice to establish a challenge for cause. This was underscored by the majority opinion in *Riley v. State*, 889 S.W.2d 290 (Tex.Cr.App.1994) (Opinion on State's motion for rehearing). There we observed:

> "Under former Article 37.071, [supra], any venireman who could answer the special issues according to the evidence, without conscious distortion or bias, could follow the law, irrespective of his willingness to

**2.** It appears in *Fuller* that the State failed to question the venireman whether her personal requirement that a capital accused be proven a serial killer before she would "consider capital punishment" would cause her either to vote to acquit at the guilt phase of trial or distort her answer to a special issue at the punishment phase. Thus it is impossible to tell whether her own personal preference or bias would likely prevent her from following the law. We opined in *Fuller* that such specific questioning was no longer "a prerequisite to the exclusion of a prospective juror for bias or prejudice against the death penalty. See *Farris v. State*, 811 S.W.2d 577 (Tex.Cr.App.1991)." 829 S.W.2d at 200. But this notion, taken from *Farris*, that the proponent of a challenge for cause need not ask questions designed to show that an apparent bias against the law will be so great as to cause the prospective juror to heed his prejudice rather than follow the law, was roundly rejected by our subsequent opinion in *Riley v. State*, 889 S.W.2d

290, at 300–301 (Tex.Cr.App.1994) (Opinion on State's motion for rehearing). Since *Riley* it has been observed:

> "Of course, a venireperson's attitude about when capital punishment is appropriate cannot take precedence over what the law defines as death-eligibility. In order to meet its burden to show a venireman will in fact allow his attitude to take precedence over the law, however, the State must explain the law to him, and ask him whether, given his 'conflicting views' he can abide by it. In *Fuller*, the State did not ask these questions of venireperson White. After *Riley*, that 'neither party took the time to explore [White's] views with a precision sufficient to resolve the ambiguity[,]' see *Fuller*, supra, at 201, must cut against the party with the burden, the challenging party, namely, the State."

*Rachal v. State*, supra at 823 (Clinton, J., concurring, joined by Baird and Meyers, JJ.).

'accept' the death penalty in the abstract. As long as his rejection of the death penalty, however categorical, did not substantially impair his ability to abide by his oath to render a true verdict, it did not make him challengeable for cause under our law. 'He need not himself favor the penalty under any circumstances.' *Hernandez [v. State,* 757 S.W.2d 744,] at 752 [(Tex.Cr. App.1988) (Plurality opinion) ]."

*Id.,* at 301. Thus we have made it clear that potential jurors need not agree with the law in order to be able to follow it. A venireman has not shown he will "substitute" his "personal preferences and biases" about what the law ought to be unless and until he indicates it is his "personal preferences and biases" he will apply in the jury room, rather than the law. This is as true of the law defining death eligibility as any other aspect of the law. A venireman who would require proof of a prior murder before he would be willing under any circumstances personally to assess a death sentence may yet be capable of putting that personal attitude behind him and answering special issues in accordance with the evidence, come what may. Until the State establishes otherwise, it has not shown the venireman to be challengeable for cause on account of an inability to follow the law. *Id.*

 In any event, in saying she would need proof of a prior murder before she could find future dangerousness, Durling did not indicate a disagreement with the law's definition of death eligibility. She demonstrated no "personal preference or bias" that was at odds with the law. A venireman who predicts he would require proof of a prior murder before he would be convinced beyond a reasonable doubt that the accused would commit criminal acts of violence that would constitute a continuing threat to society is not a venireman who has shown he cannot render a true verdict consistent with the law's contemplation of death eligibility. "A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the [future dangerousness] special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite." *Garrett v. State,* supra, at 859. "A venireperson is not challengeable when he says he would never answer the

[future dangerousness] special issue affirmatively without evidence of a prior murder if by that he simply means he does not think the State can convince him beyond a reasonable doubt that the accused will pose a future danger without such evidence." *Rachal v. State,* supra, at 821 (Clinton, J., concurring, joined by Baird and Meyers, JJ.). A venireman who requires evidence of a prior murder has not demonstrated an inability to abide by the law if his requirement is predicated upon his personal threshold of reasonable doubt. The State must show more, *viz:* that the venireman's insistence on evidence of a prior murder will prevent him from honestly answering the special issue *regardless* of whether he was otherwise convinced beyond a reasonable doubt of future dangerousness, before it can be said it has met its burden to demonstrate the venireman cannot follow the law. *Castillo v. State,* supra, at 534.

The judgment of the trial court is vacated and the cause remanded to that court for a new punishment hearing. Article 44.29(c), supra; *Ransom v. State,* supra.

BAIRD, J., concurs. I concur in that portion of Judge Clinton's opinion relating to veniremember Durling for the reasons stated on original submission, *See Howard v. State,* 941 S.W.2d 102, 126 (Tex.Cr.App.1996) (CLINTON, BAIRD and MALONEY, JJ., dissenting). However, because we sustain that portion of the motion for rehearing, there is no need to address the propriety of the trial judge's excusal for cause of veniremember Ochoa. Therefore, that portion of the *motion for rehearing should be dis-missed.* With these comments, I join only the judgment of the Court.

McCORMICK, P.J., dissents with the following note: I dissent to the Court's disposition of point of error one for the reasons set out in my dissenting opinion in *Zinger v. State,* 932 S.W.2d 511, 516–18 (Tex.Cr.App. 1996) (McCormick, P.J., dissenting).

MALONEY, J., I disagree with the Court's disposition as to venireman Ochoa because the State did not demonstrate that Ochoa, absent certain types of evidence, would answer the first special issue "no," even if she believed *beyond a reasonable*

doubt that the defendant presented a future danger. I otherwise join the Court's opinion.

WHITE, MANSFIELD and KELLER, JJ., dissent.