

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00125-CR

**CHUCK OLIVER,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 272nd District Court
Brazos County, Texas
Trial Court No. 06-03016-CRF-272**

## MEMORANDUM  OPINION

A jury found Appellant Chuck Oliver guilty of aggravated robbery, and the trial court assessed his punishment, enhanced by two previous felony convictions, at life imprisonment.  In two issues, Oliver appeals the trial court's judgment.  We will affirm.

### Background

Anna Pena testified that she and fellow bank teller Leigh Lindemann were scheduled to open the State Bank in College Station on Saturday, April 15, 2006.  Pena arrived at the bank that morning first and waited in her car for Lindemann to arrive.

Just after Lindemann arrived, another car pulled into the bank parking lot and blocked in both women's cars.

Lindemann testified that three men jumped out of the car before the car drove off. Two of the men went to Pena's car, and one of the men approached her front passenger door. The man tapped on the passenger window with a gun and made a hand motion for her to unlock her car. She complied, and the man got into the car. Once inside the car, the man held the gun in his lap, pointed in her direction. She looked in her rearview mirror and saw the other two men taking Pena inside the bank.

Pena testified that a man wearing a ski mask and holding a gun came over to the driver's side of her car. He motioned for her to open the door and then reached for her door handle. She got out of the car, ran to the bank door, opened it, and then disarmed the alarm. Once inside, the men wanted the money out of the vault, so she opened the vault door. She was going to give them the money from her cash drawer, but she had left her keys in her car. When she told the men that she did not have her keys, one of the men used a two-way radio or cell phone to tell someone outside to get her keys. Thereafter, one of the men came in with her purse and a small school bag and threw them on the floor. Once she got her keys, she opened her cash drawer and gave them the money. The men put the money in a red bank bag.

Lindemann testified that, meanwhile, outside the bank, a truck drove through the parking lot. This seemed to make the man in her car nervous, and he asked her who was in the truck. She told him that she was sure it was just a customer arriving early. The man then became agitated and asked to use her cell phone. When she gave him her

phone, he dialed and put the phone to his ear but never spoke to anyone. He then took her inside the bank.

Pena testified that Lindemann came into the vault room with a man who was also wearing a ski mask. Pena stated that all the men she saw that day were wearing ski masks and seemed to be working together. The men wanted the money from Lindemann's cash drawer as well, but Lindemann did not have her keys. The men then tied each woman's wrists together with duct tape, walked them to the women's restroom, and told them to sit down and wait. They waited for "a little while" and then were able to get the duct tape off of Pena's wrists and run outside.

## Corroboration of Accomplice Testimony

In his first issue, Oliver argues that, when the accomplice witness testimony is eliminated from consideration, the evidence is insufficient to connect him with the offense as required by Article 38.14 of the Code of Criminal Procedure.

Accomplices Darren Mack, Jaron Washington, and Edward Crain all testified at Oliver's trial. Mack testified that Crain, Washington, Oliver, Stacy Maloney, and he were involved in the robbery. They had traveled to College Station in three cars—a brown Riviera, a black Acura belonging to Oliver and his girlfriend, and a maroon Caprice. The morning of the robbery, Maloney waited with one of the cars while the four men went to the bank. Crain drove the car. Oliver rode in the front passenger seat and had a "Glock .40, Smith & Wesson" with him. They also had "chirper phones." Crain had his phone, and Washington had Oliver's phone.

They sat behind a shopping center until Crain noticed a car pulling into the bank parking lot. They then pulled into the lot and blocked the car in. Mack jumped out of the car, grabbed one of the women, and had her open the bank door. Oliver dealt with the second woman. Washington called Crain to get one of the women's purses from her car. Crain came and gave them the purse, and the woman used her key to open her work drawer. Mack saw Oliver come in with the second woman. Washington and he then taped the women's hands and left them in the restroom.

After the robbery, they left the getaway car in College Station. Maloney was waiting with another car. They eventually went back to the Dallas area. Each person received $1,800 of the money from the robbery. A few weeks later, Mack was arrested along with Oliver and Crain in West Memphis, Arkansas. Pursuant to a plea agreement, he pled guilty to aggravated robbery and was sentenced to twenty-one years' imprisonment.

Washington testified similarly: They went to College Station in three different cars. On the way to the bank, Crain drove the car, and Oliver rode in the passenger seat. They all wore ski masks. Crain, Mack, and Oliver had guns, and he had duct tape. When they got out of the vehicle at the bank, he got one of the women and went inside the bank. At some point, he talked on the phone to Crain. He had Crain's phone, and Crain had Oliver's phone. Eventually, he took the woman back to a place near the vault and started putting money in the red bank bag. Oliver came in later with the other woman. He tied both women up with the duct tape. After they left the bank, they left the car. Crain, Mack, Oliver, Maloney, and he got a cut of the money from the robbery.

He was later arrested in the Dallas area driving Oliver's black Acura. He cooperated and received ten years in prison for his involvement in this aggravated robbery.

Crain testified as follows: Oliver, Mack, Washington, Maloney, and he were involved in the robbery, and they all got a cut of the money. His role in the robbery was as the driver. He had an assault rifle AR-15, Mack had a pistol grip '04 shotgun, 12-gauge, and Oliver had a .40 cal. Oliver's gun was his own, and it had silver at the top and a black handle. They had brought three cars down for the robbery—Oliver's black Acura, a burgundy Caprice, and a tan Riviera. On the morning of the robbery, they got ready at the EZ Travel Motel. Oliver, Mack, and Washington all had ski masks; Crain had a beanie. They also all wore gloves.

They parked the cars at an apartment complex, and Maloney waited there. The four men then waited behind a store next door to the bank. Crain was driving, and Oliver was in the passenger seat. They saw two cars pull into the bank parking lot and knew they were there to open the bank. He pulled into the parking lot and stopped in front of the two cars. Washington, Mack, and Oliver got out. Mack and Washington went into the bank with one woman; Oliver got into the car with the other woman. He drove off while the robbery was taking place. They were all communicating through "chirper or chirp phones." At some point, Mack "chirped" him and told him that they left the woman's bags in her car. He drove back around and got the bag out of the car. At that time, he saw Oliver go into the bank with one of the women. He threw the bags into the bank and went back to the car.

Eventually, Oliver, Mack, and Washington came out of the bank and got into the car with him. They left the car that they had used in the robbery at the apartment complex and got into the other cars. Pursuant to a plea agreement, he pled guilty to this aggravated robbery and received fifteen years' imprisonment.

Article 38.14 provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). "This accomplice witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; '[e]ach case must be judged on its own facts.'" *Id.* (quoting *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). "While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances,

may tend to connect the accused to the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Id.*

The non-accomplice evidence tending to connect Oliver with the aggravated robbery is as follows:

- Lindemann testified that three men jumped out of the robbers' car and then the car drove off, indicating that at least four people were involved in the robbery at the bank.

- Lindemann identified the car used in the robbery, and the forensic scientist from the Texas Department of Public Safety Crime Lab testified that the partial DNA profile obtained from the passenger front door handle of the car is consistent with Oliver's DNA profile and that "[h]e cannot be excluded as a contributor of the stain." She stated that the probability of selecting an unrelated person at random who could be the source of the DNA profile was approximately 1 in 2.458 quintillion for Caucasians, 1 in 365.4 trillion for African Americans, and 1 in 817.7 quintillion for Hispanics.

- A letter from Oliver to Mack while both were in the Brazos County Jail stated:

> you see I talked to my lawyer on monday and he told me that Jarvis told him that they have my DNA in a car. I asked him why is it that Jarvis told him this when – IF my DNA matched up He should've new [sic] this, and not the DA telling him.
>
> So write [sic] now I'm trying to get this time down to 15 like Edward, I told my lawyer to go check. BUT <u>you</u> and <u>Diamond</u> dont [sic] take no time. Show your lawyer this letter but dont [sic] let him keep it. As soon as I get my time dont [sic] let them put me on the chain to prison.

I'm going to trial with you. When the State puts Edward on the stand for them. I'm getting on the stand for you – and I'll tell them who did what Edward – Lil B – Bro and Way – I'm going to send you home to take care of C.C. and Monie, . . . .

- Detective Michael Pavelka testified that Oliver lived in Arlington, Texas. However, Oliver's cell phone was used several times on April 14, 2006, near cell site PTX024PR_IOTEXASAM (HOUS-4) 3467, which is located on top of the Clarion Hotel in College Station, and cell site PTX047PR_IOWELBRNRD (HOUS-4) 3467, which is located on Wellborn Road in College Station. Oliver's phone records also show that on April 15, 2006, from 7:55 a.m. to 8:26 a.m., his push-to-talk number contacted Stacy Maloney's push-to-talk number five times and Crain's girlfriend's push-to-talk number four times.

- Lieutenant Larry Mitchell of the West Memphis, Arkansas Police Department testified that Oliver was arrested at a motel in West Memphis along with Mack and Crain. They were arrested on or about May 11, 2006.

- Mary Higar, the lobby manager for State Bank, testified that $9,596 was the amount that was missing after the robbery. Lieutenant Mitchell testified that cash was found in all three of the West Memphis motel rooms where Oliver, Mack, and Crain were arrested. $10,018 was found in Oliver's room, $1,178.50 was found in Mack's room, and $6,997 was found in Crain's room.

- Lindemann described the gun used by the man in her car as a small silver pistol. Lieutenant Mitchell testified that a .40 caliber Smith & Wesson pistol was found in Mack's West Memphis motel room. The gun was silver on top and black on the

bottom, and the serial number for the gun was PBU0783. Detective Pavelka testified that several days earlier, a 1996 black Acura had been searched in the Arlington/Grand Prairie area. A gun case for a .40 caliber Smith & Wesson, serial number PBU0783, was found in the car, along with insurance paperwork that listed Oliver as an insured.

We hold that this non-accomplice evidence tends to connect Oliver with the offense and therefore provides sufficient corroboration for the accomplice-witness testimony of Mack, Washington, and Crain. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. Accordingly, we overrule Oliver's first issue.

**Presence of Uniformed Officers in Courtroom**

In his second issue, Oliver contends that the trial court erred in allowing uniformed officers to be seated behind him during the trial because it prejudiced him.

To prevail on a claim of prejudice resulting from external influence on the jurors, an appellant must show either actual or inherent prejudice. *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996). The test to determine actual prejudice is whether the jurors actually articulated a consciousness of some prejudicial effect. *Id.* To determine inherent prejudice, we look to whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 1346-47, 89 L.Ed.2d 525 (1986). Inherent prejudice rarely occurs and "is reserved for extreme situations." *Howard*, 941 S.W.2d at 117. The Court of Criminal Appeals has "long held that spectator conduct or expression which impeded normal trial proceedings would not result in reversible error unless an appellant showed a

reasonable probability that the conduct or expression interfered with the jury's verdict."

*Id.*

In this case, Oliver does not show actual prejudice because the jurors did not indicate that they were influenced by the presence of the officers. Likewise, Oliver is unable to show inherent prejudice. The record reflects that two uniformed officers were seated nine feet behind Oliver in the gallery throughout his trial. There is no showing that they engaged in any conduct or expression that caused confusion, distracted the attention of the jurors, or would have interfered with the jury's verdict. Thus, the officers' presence did not violate Oliver's right to trial by an impartial jury. *See Holbrook*, 475 U.S. at 562, 571, 106 S.Ct. at 1342, 1347 (holding that supplementing the customary courtroom security force "by four uniformed state troopers sitting in the first row of the spectator's section" did not deprive the defendant of his constitutional right to a fair trial); *see also Carrasquillo v. State*, 742 S.W.2d 104, 112 (Tex. App.—Fort Worth 1987, no pet.). We overrule his second issue.

Having overruled Oliver's two issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Reyna, and
     Justice Davis
Affirmed
Opinion delivered and filed January 6, 2010
Do not publish
[CRPM]