IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00125-CR

 

Chuck Oliver,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 

 



From the 272nd District
Court

Brazos County, Texas

Trial Court No. 06-03016-CRF-272

 



MEMORANDUM  Opinion



 








A jury found Appellant Chuck Oliver
guilty of aggravated robbery, and the trial court assessed his punishment,
enhanced by two previous felony convictions, at life imprisonment.  In two
issues, Oliver appeals the trial court’s judgment.  We will affirm.

Background

            Anna Pena testified that she
and fellow bank teller Leigh Lindemann were scheduled to open the State Bank in
College Station on Saturday, April 15, 2006.  Pena arrived at the bank that
morning first and waited in her car for Lindemann to arrive.  Just after
Lindemann arrived, another car pulled into the bank parking lot and blocked in
both women’s cars.  

Lindemann testified that three men
jumped out of the car before the car drove off.  Two of the men went to Pena’s
car, and one of the men approached her front passenger door.  The man tapped on
the passenger window with a gun and made a hand motion for her to unlock her
car.  She complied, and the man got into the car.  Once inside the car, the man
held the gun in his lap, pointed in her direction.  She looked in her rearview
mirror and saw the other two men taking Pena inside the bank.  

Pena testified that a man wearing a ski
mask and holding a gun came over to the driver’s side of her car.  He motioned
for her to open the door and then reached for her door handle.  She got out of
the car, ran to the bank door, opened it, and then disarmed the alarm.  Once
inside, the men wanted the money out of the vault, so she opened the vault
door.  She was going to give them the money from her cash drawer, but she had
left her keys in her car.  When she told the men that she did not have her
keys, one of the men used a two-way radio or cell phone to tell someone outside
to get her keys.  Thereafter, one of the men came in with her purse and a small
school bag and threw them on the floor.  Once she got her keys, she opened her
cash drawer and gave them the money.  The men put the money in a red bank bag.

  Lindemann testified that, meanwhile,
outside the bank, a truck drove through the parking lot.  This seemed to make
the man in her car nervous, and he asked her who was in the truck.  She told
him that she was sure it was just a customer arriving early.  The man then became
agitated and asked to use her cell phone.  When she gave him her phone, he
dialed and put the phone to his ear but never spoke to anyone.  He then took
her inside the bank.

Pena testified that Lindemann came into
the vault room with a man who was also wearing a ski mask.  Pena stated that
all the men she saw that day were wearing ski masks and seemed to be working
together.  The men wanted the money from Lindemann’s cash drawer as well, but Lindemann
did not have her keys.  The men then tied each woman’s wrists together with
duct tape, walked them to the women’s restroom, and told them to sit down and
wait.  They waited for “a little while” and then were able to get the duct tape
off of Pena’s wrists and run outside.

Corroboration of Accomplice Testimony

In his first issue, Oliver argues that,
when the accomplice witness testimony is eliminated from consideration, the
evidence is insufficient to connect him with the offense as required by Article
38.14 of the Code of Criminal Procedure. 

Accomplices Darren Mack, Jaron
Washington, and Edward Crain all testified at Oliver’s trial.  Mack testified that
Crain, Washington, Oliver, Stacy Maloney, and he were involved in the robbery. 
They had traveled to College Station in three cars—a brown Riviera, a black
Acura belonging to Oliver and his girlfriend, and a maroon Caprice.  The
morning of the robbery, Maloney waited with one of the cars while the four men
went to the bank.  Crain drove the car.  Oliver rode in the front passenger
seat and had a “Glock .40, Smith & Wesson” with him.  They also had
“chirper phones.”  Crain had his phone, and Washington had Oliver’s phone.  

They sat behind a shopping center until
Crain noticed a car pulling into the bank parking lot.  They then pulled into
the lot and blocked the car in.  Mack jumped out of the car, grabbed one of the
women, and had her open the bank door.  Oliver dealt with the second woman.  Washington
called Crain to get one of the women’s purses from her car.  Crain came and
gave them the purse, and the woman used her key to open her work drawer.  Mack
saw Oliver come in with the second woman.  Washington and he then taped the women’s
hands and left them in the restroom.

After the robbery, they left the getaway
car in College Station.  Maloney was waiting with another car.  They eventually
went back to the Dallas area.  Each person received $1,800 of the money from
the robbery.  A few weeks later, Mack was arrested along with Oliver and Crain
in West Memphis, Arkansas.  Pursuant to a plea agreement, he pled guilty to
aggravated robbery and was sentenced to twenty-one years’ imprisonment.

Washington testified similarly:  They went
to College Station in three different cars.  On the way to the bank, Crain
drove the car, and Oliver rode in the passenger seat.  They all wore ski
masks.  Crain, Mack, and Oliver had guns, and he had duct tape.  When they got
out of the vehicle at the bank, he got one of the women and went inside the
bank.  At some point, he talked on the phone to Crain.  He had Crain’s phone,
and Crain had Oliver’s phone.  Eventually, he took the woman back to a place
near the vault and started putting money in the red bank bag.  Oliver came in
later with the other woman.  He tied both women up with the duct tape.  After
they left the bank, they left the car.  Crain, Mack, Oliver, Maloney, and he
got a cut of the money from the robbery.  He was later arrested in the Dallas area
driving Oliver’s black Acura.  He cooperated and received ten years in prison
for his involvement in this aggravated robbery.

Crain testified as follows:  Oliver,
Mack, Washington, Maloney, and he were involved in the robbery, and they all
got a cut of the money.  His role in the robbery was as the driver.  He had an
assault rifle AR-15, Mack had a pistol grip ’04 shotgun, 12-gauge, and Oliver
had a .40 cal.  Oliver’s gun was his own, and it had silver at the top and a
black handle.  They had brought three cars down for the robbery—Oliver’s black
Acura, a burgundy Caprice, and a tan Riviera.  On the morning of the robbery,
they got ready at the EZ Travel Motel.  Oliver, Mack, and Washington all had
ski masks; Crain had a beanie.  They also all wore gloves.

They parked the cars at an apartment
complex, and Maloney waited there.  The four men then waited behind a store
next door to the bank.  Crain was driving, and Oliver was in the passenger
seat.  They saw two cars pull into the bank parking lot and knew they were
there to open the bank.  He pulled into the parking lot and stopped in front of
the two cars.  Washington, Mack, and Oliver got out.  Mack and Washington went
into the bank with one woman; Oliver got into the car with the other woman.  He
drove off while the robbery was taking place.  They were all communicating
through “chirper or chirp phones.”  At some point, Mack “chirped” him and told
him that they left the woman’s bags in her car.  He drove back around and got
the bag out of the car.  At that time, he saw Oliver go into the bank with one
of the women.  He threw the bags into the bank and went back to the car.

Eventually, Oliver, Mack, and Washington
came out of the bank and got into the car with him.  They left the car that
they had used in the robbery at the apartment complex and got into the other
cars.  Pursuant to a plea agreement, he pled guilty to this aggravated robbery
and received fifteen years’ imprisonment.

Article 38.14 provides, “A conviction
cannot be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.”  Tex. Code Crim. Proc. Ann.
art. 38.14 (Vernon 2005).  “This accomplice witness rule creates a statutorily
imposed review and is not derived from federal or state constitutional
principles that define the legal and factual sufficiency standards.”  Druery
v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).

“When evaluating the sufficiency of
corroboration evidence under the accomplice-witness rule, we ‘eliminate the
accomplice testimony from consideration and then examine the remaining portions
of the record to see if there is any evidence that tends to connect the accused
with the commission of the crime.’”  Malone v. State, 253 S.W.3d 253,
257 (Tex. Crim. App. 2008) (quoting Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001)).  “There is no set amount of non-accomplice
corroboration evidence that is required for sufficiency purposes; ‘[e]ach case
must be judged on its own facts.’”  Id. (quoting Gill v. State,
873 S.W.2d 45, 48 (Tex. Crim. App. 1994)).  “While the accused’s mere presence
in the company of the accomplice before, during, and after the commission of
the offense is insufficient by itself to corroborate accomplice testimony,
evidence of such presence, coupled with other suspicious circumstances, may
tend to connect the accused to the offense.”  Dowthitt v. State, 931
S.W.2d 244, 249 (Tex. Crim. App. 1996).  “Even apparently insignificant
incriminating circumstances may sometimes afford satisfactory evidence of
corroboration.”  Id.

The non-accomplice evidence tending to
connect Oliver with the aggravated robbery is as follows:

·                    
Lindemann testified
that three men jumped out of the robbers’ car and then the car drove off,
indicating that at least four people were involved in the robbery at the bank.

·                    
Lindemann identified
the car used in the robbery, and the forensic scientist from the Texas Department
of Public Safety Crime Lab testified that the partial DNA profile obtained from
the passenger front door handle of the car is consistent with Oliver’s DNA
profile and that “[h]e cannot be excluded as a contributor of the stain.”  She
stated that the probability of selecting an unrelated person at random who
could be the source of the DNA profile was approximately 1 in 2.458 quintillion
for Caucasians, 1 in 365.4 trillion for African Americans, and 1 in 817.7
quintillion for Hispanics.  

·                    
A letter from Oliver
to Mack while both were in the Brazos County Jail stated:

you see I talked to my lawyer on monday
and he told me that Jarvis told him that they have my DNA in a car.  I asked
him why is it that Jarvis told him this when – IF my DNA matched up He should’ve
new [sic] this, and not the DA telling him.

 

So write [sic] now I’m trying to get
this time down to 15 like Edward, I told my lawyer to go check.  BUT you
and Diamond dont [sic] take no time.  Show your lawyer this letter but
dont [sic] let him keep it.  As soon as I get my time dont [sic] let them put
me on the chain to prison.  I’m going to trial with you.  When the State puts
Edward on the stand for them.  I’m getting on the stand for you – and I’ll tell
them who did what Edward – Lil B – Bro and Way – I’m going to send you home to
take care of C.C. and Monie, . . . .

 

·                    
Detective Michael
Pavelka testified that Oliver lived in Arlington, Texas.  However, Oliver’s
cell phone was used several times on April 14, 2006, near cell site
PTX024PR_IOTEXASAM (HOUS-4) 3467, which is located on top of the Clarion Hotel
in College Station, and cell site PTX047PR_IOWELBRNRD (HOUS-4) 3467, which is
located on Wellborn Road in College Station.  Oliver’s phone records also show
that on April 15, 2006, from 7:55 a.m. to 8:26 a.m., his push-to-talk number
contacted Stacy Maloney’s push-to-talk number five times and Crain’s girlfriend’s
push-to-talk number four times.

·                    
Lieutenant Larry
Mitchell of the West Memphis, Arkansas Police Department testified that Oliver
was arrested at a motel in West Memphis along with Mack and Crain.  They were
arrested on or about May 11, 2006.

·                    
Mary Higar, the
lobby manager for State Bank, testified that $9,596 was the amount that was
missing after the robbery.  Lieutenant Mitchell testified that cash was found
in all three of the West Memphis motel rooms where Oliver, Mack, and Crain were
arrested.  $10,018 was found in Oliver’s room, $1,178.50 was found in Mack’s room,
and $6,997 was found in Crain’s room.

·                    
Lindemann described
the gun used by the man in her car as a small silver pistol.  Lieutenant
Mitchell testified that a .40 caliber Smith & Wesson pistol was found in
Mack’s West Memphis motel room.  The gun was silver on top and black on the
bottom, and the serial number for the gun was PBU0783.  Detective Pavelka
testified that several days earlier, a 1996 black Acura had been searched in
the Arlington/Grand Prairie area.  A gun case for a .40 caliber Smith &
Wesson, serial number PBU0783, was found in the car, along with insurance
paperwork that listed Oliver as an insured.

We hold that this non-accomplice
evidence tends to connect Oliver with the offense and therefore provides
sufficient corroboration for the accomplice-witness testimony of Mack,
Washington, and Crain.  See Tex.
Code Crim. Proc. Ann. art. 38.14.  Accordingly, we overrule Oliver’s
first issue.

Presence of Uniformed Officers in
Courtroom

            In his second issue, Oliver
contends that the trial court erred in allowing uniformed officers to be seated
behind him during the trial because it prejudiced him.

            To prevail on a claim of
prejudice resulting from external influence on the jurors, an appellant must
show either actual or inherent prejudice.  Howard v. State, 941 S.W.2d
102, 117 (Tex. Crim. App. 1996).  The test to determine actual prejudice is
whether the jurors actually articulated a consciousness of some prejudicial
effect.  Id.  To determine inherent prejudice, we look to whether “an
unacceptable risk is presented of impermissible factors coming into play.”  Holbrook
v. Flynn, 475 U.S. 560, 570, 106 S.Ct. 1340, 1346-47, 89 L.Ed.2d 525 (1986). 
Inherent prejudice rarely occurs and “is reserved for extreme situations.”  Howard,
941 S.W.2d at 117.  The Court of Criminal Appeals has “long held that spectator
conduct or expression which impeded normal trial proceedings would not result
in reversible error unless an appellant showed a reasonable probability that
the conduct or expression interfered with the jury’s verdict.”  Id.

            In this case, Oliver does
not show actual prejudice because the jurors did not indicate that they were
influenced by the presence of the officers.  Likewise, Oliver is unable to show
inherent prejudice.  The record reflects that two uniformed officers were
seated nine feet behind Oliver in the gallery throughout his trial.  There is
no showing that they engaged in any conduct or expression that caused
confusion, distracted the attention of the jurors, or would have interfered
with the jury’s verdict.  Thus, the officers’ presence did not violate Oliver’s
right to trial by an impartial jury.  See Holbrook, 475 U.S. at 562,
571, 106 S.Ct. at 1342, 1347 (holding that supplementing the customary
courtroom security force “by four uniformed state troopers sitting in the first
row of the spectator’s section” did not deprive the defendant of his
constitutional right to a fair trial); see also Carrasquillo v. State,
742 S.W.2d 104, 112 (Tex. App.—Fort Worth 1987, no pet.).  We overrule his
second issue.

            Having overruled Oliver’s
two issues, we affirm the trial court’s judgment.

 

REX D. DAVIS

Justice

 

Before
Chief Justice Gray,

Justice Reyna, and

Justice Davis

Affirmed

Opinion
delivered and filed January 6, 2010

Do
not publish

[CRPM]