**AFFIRM; and Opinion Filed January 16, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00817-CR

### RAYNALDO RIVERA ORTIZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law No. 4**
**Collin County, Texas**
**Trial Court Cause No. 004-85328-2015**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Boatright
Opinion by Justice Brown

After his neighbor's dog was shot, Raynaldo Rivera Ortiz was charged with the misdemeanor offense of cruelty to a nonlivestock animal. A jury found appellant guilty. The trial court assessed appellant's punishment at confinement for one year and a $4,000 fine, suspended the sentence, and placed appellant on community supervision for two years. In five issues, appellant contends (1) the evidence is legally insufficient to prove he committed the offense; (2) he was not given an opportunity to examine and object to the proposed jury charge; (3) the trial court erred in giving the jury an *Allen* charge; (4) the information was not correctly read to the jury; and (5) trial proceedings were void because the information was presented without a valid supporting affidavit. We affirm the trial court's judgment.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends the evidence is legally insufficient to prove he committed cruelty to a nonlivestock animal. The information alleged appellant "intentionally, knowingly, and recklessly caused bodily injury to an animal, to-wit: a dog by shooting the dog with a pellet gun, without the effective consent of Roxanne Bogdan, the owner." See TEX. PENAL CODE ANN. § 42.092(b)(6) (West Supp. 2017). Appellant maintains the evidence is insufficient to prove he was the person who shot Bogdan's dog.

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a factfinder was rationally justified in finding guilt beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). Direct evidence and circumstantial evidence are equally probative. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Temple*, 390 S.W.3d at 360.

At trial, Bogdan testified that in April 2015, she lived in Murphy, Texas, and had lived there for about ten years. Appellant lived in the house next door, and he lived there when Bogdan moved in. Their backyards were separated by a wrought iron fence. For years Bogdan's relationship with appellant was neighborly, but that changed at the end of 2014. On December 29, 2014, appellant and his then girlfriend, Sandy Abel, got in an argument. Bogdan was at appellant's house at the time. The police were eventually called and appellant was arrested. Bogdan helped Abel move out of appellant's house that night. In January 2015, Bogdan testified about that argument in a court proceeding for a protective order. In March 2015, appellant told Bogdan that

–2–

he blamed her for his split with Abel. The day prior to the shooting, Bogdan visited Abel at her home. While Bogdan was there, appellant called Abel to ask if he could have their son on appellant's birthday the following day, and Abel put the call on speakerphone. Bogdan advised Abel to check her custody papers. After checking the papers, Abel told appellant he could not have their son. Bogdan heard appellant on the speaker, and he sounded angry.

The next afternoon, April 29, 2015, someone shot one of Bogdan's three dogs. Bogdan heard the shot while she was in her bedroom and heard her dog scream. Right before she heard the shot, Bogdan heard appellant drive into his driveway. Bogdan testified she knew it was appellant because he usually comes home around that time, and the car she heard was a "very loud sports car." Appellant has three or more Corvettes, and according to Bogdan, "it's a very loud, distinctive roar when [appellant] comes home." Appellant's home had a circle driveway and more parking in the back on the other side of a porte-cochere that he could pull through. Bogdan testified that her bed "backs up" to appellant's property. An overhead photograph of the neighborhood was admitted into evidence showing the proximity of appellant's driveway to Bogdan's house. Bogdan testified that she heard the shot less than fifteen minutes after she heard appellant's car come into the driveway. She estimated she heard the shot at about 2:30 p.m. She then ran into her backyard and saw her dog's chest covered in blood. Bogdan called a friend who came to take her and her dog to the animal hospital. The dog survived.

Bogdan immediately believed appellant shot her dog. She called 911 on the way to the animal hospital and reported that belief. Bogdan testified appellant shot rabbits in his own yard. The rabbits ran into Bogdan's yard and died. Over the years, appellant had shot rabbits "a lot." Bogdan did not know much about guns. She testified that the guns appellant used looked more like rifles than pellet guns. After Bogdan testified against appellant in January 2015, appellant was not allowed to have guns. The week before her dog was shot, Bogdan found a dead rabbit in

her yard. The rabbit looked like it had been shot with some kind of gun. When asked what side of her yard the rabbit was on, she indicated the rabbit was near appellant's fence. Two photographs of guns were admitted into evidence. Bogdan identified one of the guns as appellant's pellet gun. She also identified a picture of appellant with the gun. Bogdan did not have any arguments or disputes with other neighbors who lived near her. To her knowledge, none of the other families around her owned pellet guns.

On cross-examination, Bogdan testified that Abel took the guns with her when she left appellant's house and Bogdan did not know if Abel still had them. Bogdan admitted she did not see appellant shoot her dog and did not see him with a pellet gun on April 29.

The veterinarian who treated Bogdan's dog after the incident testified about the dog's injuries. He identified pictures and X-rays that showed the pellet hole and the pellet in the dog's chest.

Julie Stephens testified that appellant was her neighbor. She was familiar with the location of his house and the type of cars he drives. She testified that she saw one of appellant's cars, a white Corvette, on the afternoon of April 29, 2015, when she was out walking her dog. Stephens estimated that she left her house at 2:14 p.m. and returned at about 2:33 p.m. The "roar of the car as it turned" first caught her attention. Stephens indicated the direction from which appellant's car approached on an overhead image of the neighborhood. She saw the car pull into appellant's driveway. She thought nothing of it at the time, but a detective contacted her later to ask for footage from her surveillance camera. A video taken by a camera above Stephens's garage was admitted into evidence and showed to the jury. Stephens testified the video showed her walking and showed a white car driving past her. Based on numbers on the video, Stephens estimated that the car passed her at about 2:26 p.m. Stephens did not look inside the Corvette to see who was driving.

Jordan Abel, the daughter of appellant's ex-girlfriend, had lived with appellant next to Bogdan for eight years. Jordan testified appellant mentioned wanting to shoot Bogdan's dogs every time she was in the car with him and they drove up the driveway. Appellant would either say, "I'm going to shoot her dogs," or "I want to shoot her dogs." She estimated he said it "hundreds" of times. Jordan testified appellant made these comments because the dogs barked and it seemed he was annoyed with their barking. When appellant spoke of shooting the dogs, however, Jordan did not think he was going to shoot the dogs right then.

On cross-examination, Jordan testified she was not happy with appellant. Jordan's mother filed for divorce against appellant. At a recent court proceeding, Jordan had testified that appellant and her mother had an informal marriage. The judge determined the couple was not married. Also, Jordan testified that her boyfriend Cooper Loncar, who lived down the street from appellant, is a hunter. She had not known her boyfriend to shoot rabbits, which were very common in the neighborhood. Jordan testified the pellet guns appellant owned were with her mother.

Angelique Loncar, a neighbor of appellant's, and Cooper's mother, testified that at about 5 p.m. on April 28, 2015, she was driving past appellant's house and saw a young man carrying a gun case into the house. She thought the man was an employee of appellant's. Angelique and Cooper were both home between 2 and 3 p.m. on the day of the shooting.

Murphy Police Officer Matt Fraley met Bogdan at the animal hospital after the dog was shot and got a written statement from her. Then he went to appellant's house. Appellant denied harming the dog and told Fraley he did not have any weapons; his weapons were taken in a divorce proceeding. Appellant further informed the officer that his surveillance system was not operational because his internet was down. Fraley then went to Bogdan's house to take photographs. Several photos Fraley took of bloodstains on the patio in Bogdan's backyard were admitted into evidence. These pictures showed the proximity of appellant's driveway to the bloodstains. The officer wrote

in his report that there was a clear line of fire from appellant's back driveway to the point where the bloodspots were.

Officer Jonathan Hunter was dispatched to the scene and attempted to make contact with appellant. He arrived at about 2:46 p.m. He waited for Officer Joe Wetzel to arrive, and they approached appellant's house. There was one car parked in the circle driveway in front, a black Mercedes. Officer Hunter rang the bell and no one answered. The officer saw four vehicles in "that little driveway," a white Corvette and three others that were covered. Someone then pulled up to the house in a white Ford Taurus. He got out and identified himself as Ryan Mann. The officer understood him to be an "errand boy." Mann told the officer that appellant was not home. Officer Hunter left appellant's house to look for Bogdan and her dog at a clinic. Dispatch let him know appellant wanted to speak to an officer, and Hunter returned to appellant's house. Hunter spoke to appellant briefly. Appellant said his cameras and internet were down that day and that he had been working in Burleson and did not get home until around 3 p.m. Officer Hunter testified that the same number of vehicles were at appellant's house both times he was there that day, parked in the same places.

Officer Wetzel testified that on April 29, 2015, he was dispatched to appellant's house and arrived at the house at 2:46 p.m. Officer Hunter was already there. He and Officer Hunter rang the doorbell, but no one answered. Officer Wetzel saw a total of five cars parked in appellant's driveway. A black Mercedes was in the circle driveway in front of the house. The white Corvette and three covered cars were in the back behind a gate. A white Taurus pulled up, and the officers spoke to the driver, Mann. The officers left appellant's house to look for Bogdan at a nearby vet clinic. They returned to appellant's house at 3:11 p.m. Upon return, the same vehicles were parked at the house in the same locations as before. The officers spoke to appellant and he told them he had been in Burleson that day. Appellant also mentioned that his "ex-wife" had taken the pellet

guns. Officer Wetzel was asked if he knew how far Burleson is from Murphy. He stated that on a good day, with no traffic, it was about an hour and a half away, longer with traffic. Officers did not ask to search appellant's house that day or seek a search warrant.

Detective Brad Taylor interviewed Bogdan and her husband on the day of the incident and followed up with them the next day. The detective had pictures of the blood in Bogdan's backyard. He noticed that the blood splatter was in direct line with appellant's driveway. The detective also contacted Mann, who agreed to come to the police department and speak to him. Mann did not come in as scheduled and told Taylor he could not talk to him and did not want to get involved.

The detective also reported that he had contacted a Gabe Rivera. Rivera, who owned an audio-visual company, was at appellant's house on the day of the shooting, after the shooting. Taylor asked Rivera what work he had done at appellant's house. Rivera told Detective Taylor he was there to fix the internet. On May 8, appellant came to the police station to meet with Taylor. By the time Taylor got to the lobby, which he estimated was three or four minutes, appellant had left the building. From that point on, he refused to cooperate with police.

Chris Merlo, an attorney who represented appellant in the family law matter, testified for the defense. He testified that after appellant was arrested in December 2014, there was a period of time when he did not have access to his home. There was a concern some of his property had been removed or damaged. Merlo surveyed the home on January 9, 2015, and took photographs. Merlo did not believe the internet was working at appellant's house in January.

Appellant is an anesthesiologist. Terri Burson testified that she worked for two companies owned by appellant, Garland Anesthesia and Assured Medical Billing. Burson runs the offices and is the custodian of records. She identified certain records dated April 29, 2015. Defendant's Exhibit 33 was the surgery schedule for April 29, 2015. The scheduler in the office created the document. It indicated appellant was supposed to be in Burleson at 8 a.m. that day. Defendant's

Exhibit 34 was paperwork for the last procedure of the day. Appellant's handwriting was on the form and indicated that 1:36 p.m. was when he stopped the anesthesia for that patient. After anesthesia ended, appellant's responsibility was to make sure the patient is okay before he leaves the facility.

Rivera, who has a custom home theater company and does work for appellant "all the time," also testified for the defense. Rivera had installed security cameras at appellant's home. He went to appellant's home on April 29, 2015, because appellant wanted a quote for "new cameras, more cameras, and then just upgrade the entire system." Rivera got the call to go to appellant's house that same afternoon. Rivera was excited about getting the quote, so he went out at 3:30 or 4 p.m. The cameras were not operational when he got there that day. On cross-examination, Rivera testified that even though the internet was down, it would still have been possible to download footage captured by the surveillance camera.

Appellant testified that he is an anesthesiologist. On April 29, 2015, he worked at an endoscopy center in Burleson. It takes him about an hour to get there in the mornings. In the afternoons when he comes home, it takes "anywhere from an hour or two" depending on the traffic. Appellant testified about Defendant's Exhibit 33, the schedule for the Burleson endoscopy center on April 29, 2015, and Defendant's Exhibit 34, records for the last patient of the day. Appellant indicated that the end time, "13:30," was written in his handwriting.[1] He testified that was the time he got to recovery with the last patient of the day. That did not mean he could leave then; he had to stay at the facility until the nurse was comfortable with his leaving, which is usually to 20 to 30 minutes. Appellant estimated that on that day he left the endoscopy center "probably close to 2" and got home between 3:00 and 3:10. Appellant testified he has many cars and did not know which car he was driving that day. He testified he has a white Corvette, but does not drive it a lot.

---

[1] The time appears to be written as "13:36."

Mann, a college student hired to deliver anesthesia equipment, drives that car more than he does. Appellant did not drive the white Corvette to Burleson on April 29 because it was a standard and he does not feel comfortable driving it on the highway. He testified that if his white Corvette was the car in his neighbor's surveillance video, he was not driving it and did not know who was.

Appellant testified he used to have some pellet guns, and the two guns pictured in the exhibit used to be his. He used them to get rid of rabbits. He had not seen those guns since December 2014. Abel has them now. Appellant testified that Cooper Loncar owned a pellet gun, and appellant paid him to hunt an armadillo in his yard.

Appellant denied shooting Bogdan's dog. He testified that he was not home when the dog was shot and was not home when police knocked on his door at 2:46 p.m. He also denied having any conversations or disagreements with Abel on the day before the shooting.

Appellant contends the evidence is legally insufficient because there was no evidence he shot the dog or ordered the dog to be shot. He maintains the evidence irrefutably showed he was not home when the shooting occurred and that it was not rational for the jury to ignore that fact. He further asserts the State's key witnesses had a strong bias against him and the pellet guns previously in his house were not there on the day of the shooting. He contends that evidence officers saw the white Corvette at his house as early as 2:46 on the afternoon of the shooting is irrelevant because he testified he did not drive that car to Burleson.

The circumstantial evidence in this case was sufficient to prove appellant was the person who shot Bogdan's dog. Appellant had a motive to shoot the dog. He had often mentioned wanting to shoot Bogdan's dogs as they barked when he arrived home. There was evidence of animosity between appellant and Bogdan after appellant and Abel split up. Appellant blamed Bogdan for the breakup. Bogdan helped Abel move out and testified against appellant in a proceeding for a protective order. The night before the shooting, upon Bogdan's advice, Abel had told appellant

he could not have their son the next day, and appellant was angry. Bogdan testified that the next afternoon, she was in her bedroom, which was near appellant's driveway, when she heard the distinctive sound of appellant's car in the driveway. A few minutes later, she heard the shot. Appellant often used pellet guns to shoot rabbits in his yard, and there was a clear line of fire from appellant's back driveway to the bloodspots from the dog in Bogdan's backyard. While Stephens was taking a walk between 2:14 and 2:33 p.m., she saw appellant's white Corvette pull into his driveway. Officers arrived at appellant's house at about 2:46 p.m. They left and returned at 3:11 p.m. Appellant was home at 3:11, and the same cars were there in the same places as before. Appellant, who had security cameras at his home, claimed they were not working and called the man who worked on his system out to his house after the shooting. The evidence that appellant could not have been home at the time the dog was shot came from appellant himself, from his testimony and his handwriting on a patient's medical form. The jury was free to disbelieve this evidence and reject appellant's alibi defense. We defer to the jury's resolution of the inconsistencies in the evidence. After reviewing all the evidence in the light most favorable to the verdict, we conclude the jury was rationally justified in finding appellant's guilt beyond a reasonable doubt. We overrule appellant's first issue.

### OPPORTUNITY TO EXAMINE JURY CHARGE

In his second issue, appellant contends the record fails to show his trial counsel was given an opportunity to examine the proposed jury charge and make objections. The code of criminal procedure provides that before the charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine it and present any objections. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). The record in this case reflects that as soon as both sides closed, the trial court read the charge to the jury. Appellant did not raise any objection at that time. The record does not affirmatively show that appellant had no opportunity to review the charge before it was

read to the jury. Rather, the record is silent about whether he was given such an opportunity. There could have been an off-the-record discussion about the charge, which would explain why there was no objection when the trial court proceeded to read the charge to the jury immediately after the parties closed. Further, because appellant did not object, he has failed to preserve this issue for our review. *See* TEX. R. APP. P. 33.1(a); *Khempecth v. State*, No. 05-03-00426-CR, 2004 WL 2580178, at *2–3 (Tex. App.—Dallas Nov. 15, 2004, no pet.) (not designated for publication). In addition, appellant complains of one instruction in the charge, which informed the jury that the State did not have to prove the exact date alleged in the information, but could prove the offense was committed at any time prior to the information as long as it was within the two-year limitations period. Without citation to authority, appellant contends that because there was no dispute about when the dog was shot, the instruction deprived him of his alibi defense. The complained-of instruction was a correct statement of the law. *See Knapp v. State*, 504 S.W.2d 421, 427 (Tex. Crim. App. 1973). Further, the State did not argue that appellant's alibi was invalid because the offense occurred on a different day. It argued that his alibi was not credible. Appellant has not shown that he was harmed by any lack of opportunity to review the charge. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's second issue.

### *ALLEN* CHARGE

In his third issue, appellant contends the trial court erred in giving the jury additional instructions during its deliberations. The jury began deliberations at about 2:25 p.m. on June 8, 2016. At some point, the jury foreperson wrote the judge a note stating jurors were in a 4-2 deadlock and "we do not believe there will be any movement." The judge instructed the jury in writing to continue its deliberations. The jury was excused for the night at 5 p.m. Deliberations continued on the morning of June 9. The foreperson wrote another note stating that the jurors are "still at an impasse and do not see a way for the evidence to bring us to a unanimous verdict." At

about 10:30 a.m., the judge brought the jurors into the courtroom and gave them the following version of an *Allen* charge orally and in writing:

> Ladies and gentlemen, the law contemplates that a jury will reach a verdict. It is your duty to agree on a verdict if you can do so without violating conscientiously held convictions that are based on the evidence.
>
> No juror for mere pride of opinion hastily formed or expressed should refuse to agree. Yet, no juror simply for the purpose of terminating the case, should acquiesce in a conclusion that is contrary to his own conscientiously held view of the evidence.
>
> You should listen to each other's views, talk over your differences of opinion in a spirit of fairness and candor and if possible, resolve your differences and come to a common conclusion so that a verdict may be reached and this case may be disposed of.
>
> This is an important case. If you should fail to reach a decision, the case is left open and undecided. Like all cases, it must be disposed of at some time. Another trial would be a heavy burden on both sides.
>
> There is no reason to believe that the case can be tried again any better or more exhaustively than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.
>
> Also there is no reason to believe that the case would ever be submitted to six people more intelligent and more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.
>
> You are not partisans. You are the judges-judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case. You may now retire and continue your deliberations in such a manner as may be determined by your good judgment as reasonable people.
>
> Please continue deliberating.

Appellant did not object. About an hour and a half later, the jury reached its guilty verdict.

Appellant contends the trial court's instructions were not appropriate under the circumstances and were unduly coercive. Appellant acknowledges that no objection was made, but maintains he suffered egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

–12–

The use of a supplemental charge when a jury has declared itself deadlocked has long been sanctioned by the United States Supreme Court and the Texas Court of Criminal Appeals. *Howard v. State*, 941 S.W.2d 102, 123 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014); s*ee Allen v. United States*, 164 U.S. 492, 501–02 (1896). The primary inquiry to determine the propriety of an *Allen* charge is its coercive effect on juror deliberation in its context and under all circumstances. *Howard*, 941 S.W.2d at 123. A supplemental charge which suggests that *all* jurors reevaluate their opinions in the face of disparate viewpoints cannot be said to be coercive on its face. *See id.* We review the trial court's decision to give the jury additional instructions for an abuse of discretion. *See Barnett v. State*, 189 S.W.3d 272, 274 (Tex. Crim. App. 2006).

Appellant complains of the following specific portions of the instructions: (1) The law contemplates that a jury will reach a verdict; (2) No juror for mere pride of opinion hastily formed or expressed should refuse to agree; (3) Talk over your differences of opinion in a spirit of fairness and candor; (4) Another trial would be a heavy burden on both sides; (5) There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side; and (6) You may now retire and continue your deliberations in such a manner as may be determined by your good judgment as reasonable people. Appellant contends the court's instructions effectively directed the holdout jurors to redefine their understanding of reasonable doubt.

The additional instructions in this case were directed to the jury as a whole, not to the jurors in the minority. The court instructed the jurors to continue deliberating without surrendering their honest convictions about the case. Contrary to appellant's assertion, the instructions did not convey the court's opinion of the case. The exact words used in this case have been upheld as non-coercive. *See Boyd v. State*, 644 S.W.2d 857, 858 (Tex. App.—Tyler 1982, no pet.); *see also Brown v. State*, No. 05-90-01556-CR, 1993 WL 460047, at *10–11 (Tex. App.—Dallas Nov. 10,

1993, pet. ref'd) (not designated for publication); *Mixon v. State*, 481 S.W.3d 318, 326–27 (Tex. App.—Amarillo 2015, pet. ref'd) (fact that jury deliberated for over an hour following additional charge suggests jury reached decision through continued deliberations rather than simple acquiescence by minority jurors). The court did not abuse its discretion in giving the jury additional instructions.

In addition, appellant suggests that because this was a misdemeanor case with a six-person jury, the rules should be different. He questions whether *Allen* charges should be used at all in such cases because it should be easier to convince six people of guilt beyond a reasonable doubt than it is to convince twelve. He cites no authority for this proposition. As an intermediate court of appeals, we decline appellant's invitation to change the law in this manner. Finding no error, we overrule appellant's third issue.

### COMPLAINTS INVOLVING THE INFORMATION

In his fourth issue, appellant contends he was not properly arraigned because the information was not read correctly to the jury. The record reflects that when the prosecutor read the information to the jury, several words were omitted, including "caused bodily injury to an animal."[2] Appellant did not object in the trial court to the propriety of his arraignment. Because appellant raises his complaint about the arraignment for the first time in this appeal, he has failed to preserve this issue for our review. TEX. R. APP. P. 33.1(a); *Adkison v. State*, 762 S.W.2d 255, 259 (Tex. App.—Beaumont 1988, pet. ref'd) (any error connected with failure to formally arraign defendant was waived where no objection was made in trial court). We overrule appellant's fourth issue.

---

[2] In its brief, the State responds that the information was read correctly and that a transcription error occurred. The State asserts an amended version of volume two of the Reporter's Record was filed with the Court to correct the error. However, no amended volume two was filed.

In his fifth issue, appellant contends that because the information was not presented with a valid supporting affidavit, it did not invoke the jurisdiction of the trial court. The code of criminal procedure provides that "No information shall be presented until affidavit has been made by some credible person charging the defendant with an offense." TEX. CODE CRIM. PROC. ANN. art. 21.22 (West 2009). An affidavit was filed in support of the information in this case. Appellant's complaint is that the signature of the affiant is illegible, and the identity of the affiant is not otherwise revealed in the document. Appellant did not raise this objection in the trial court. If a defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal. *Id.* art. 1.14(b) (West 2005). Appellant has waived his complaint about the affidavit supporting the information in this case. *See Ex parte Reedy*, 282 S.W.3d 492, 503 & n.57 (Tex. Crim. App. 2009). We overrule appellant's fifth issue.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).

160817F.U05

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RAYNALDO RIVERA ORTIZ, Appellant

No. 05-16-00817-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 4, Collin County, Texas
Trial Court Cause No. 004-85328-2015.
Opinion delivered by Justice Brown, Justices Lang-Miers and Boatright participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of January, 2018.